*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0391P (6th Cir.)
File Name: 02a0391p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SHEILA WHITE,
       *Plaintiff-Appellee/*
       *Cross-Appellant,*

       *v.*

BURLINGTON NORTHERN &
SANTA FE RAILWAY
COMPANY,
       *Defendant-Appellant/*
       *Cross-Appellee.*

Nos. 00-6780;
01-5024

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 99-02733—Jon Phipps McCalla, District Judge.

Argued: September 11, 2002

Decided and Filed: November 13, 2002

Before: KRUPANSKY and CLAY, Circuit Judges; GWIN,
District Judge.

_____

*The Honorable James S. Gwin, United States District Judge for the
Northern District of Ohio, sitting by designation.

1

———————————

**COUNSEL**

**ARGUED:**  Ralph T. Gibson, BATEMAN, GIBSON & CHILDERS, Memphis, Tennessee, for Appellant. William B. Ryan, DONATI LAW FIRM, Memphis, Tennessee, for Appellee.  **ON BRIEF:**  Ralph T. Gibson, BATEMAN, GIBSON & CHILDERS, Memphis, Tennessee, for Appellant. William B. Ryan, Donald A. Donati, DONATI LAW FIRM, Memphis, Tennessee, for Appellee.

GWIN, D. J., delivered the opinion of the court, in which KRUPANSKY, J., joined. CLAY, J. (pp. 22-31), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

GWIN, District Judge.  With this appeal, we examine whether actions taken by the Appellant Burlington Northern & Santa Fe Railway Co. ("Burlington Northern" or "railroad") were sufficiently adverse employment actions to sustain a cause of action under Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a).  We also review whether the district court erred when it denied the Burlington Northern's motion for judgment as a matter of a law.  In making that motion, Appellant Burlington Northern argued that the evidence was insufficient to support the jury's verdict in favor of the plaintiff on the retaliation claim.  Finally, we decide if the district court abused its discretion when awarding attorney's fees[1] to the plaintiff.

————————————————————

[1] As a matter of style, we use the phrase "attorney's fees" because that usage appears in 17 U.S.C. § 505 and is preferred by the Supreme Court. *See, e.g.*, *Stallworth v. Greater Cleveland Reg'l Transit Auth.*, 105 F.3d 252, 253 n.1 (6th Cir. 1997).

Given these inconsistencies, the jury was entitled to believe that Defendant's proffered explanations were pretextual and that the real reason for Defendant's action was unlawful retaliation.  This is particularly so when ruling on a Rule 50 motion because a court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862, 867 (6th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).  Under the applicable standard of review, Plaintiff adduced sufficient evidence to survive Defendant's motion, and the district court correctly rejected Defendant's arguments.

**Conclusion**

This Court requires that a materially adverse action "be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Hollins,* 188 F.3d at 662.  Plaintiff's thirty-seven-day suspension and her removal from the forklift position  was more than a "mere inconvenience" or otherwise *de minimus* action.  In addition, there were sufficient inconsistencies with respect to the reasons provided by Defendant to explain the actions taken against Plaintiff for the jury to infer that the reasons were pretextual.  I would therefore affirm the district court's denial of Defendant's motion for judgment as a matter of law.

Defendant's argument is without merit. Numerous inconsistencies surfaced among Defendant's witnesses at trial from which the jury could infer that the reasons proffered by Defendant were pretextual. First of all, Roadmaster Brown testified on direct examination that there had been "a lot of complaints" from senior employees in the maintenance of way department pertaining to Plaintiff, a junior employee, being allowed to work on the forklift, a comparatively light and easy job. (J.A. at 105.) However, on cross-examination, Brown's story changed. He claimed that "one, possibly two senior employees" complained about Plaintiff working on the forklift. (J.A. at 115.) He named these employees as Ellis, Gary Augustus and Darryl Knight. However, Augustus was actually junior to Plaintiff, not senior; Knight, although technically senior to Plaintiff, was hired on the same day as Plaintiff; and Ellis testified that he never made any complaints about Plaintiff operating the forklift and that Brown *requested* that Ellis return to that duty.

Roadmaster Brown's testimony was also inconsistent with Defendant's interrogatory answer as to why Plaintiff had been removed from her forklift operator duties. According to the interrogatory, a track laborer with more experience than Plaintiff had claimed the job pursuant to a collective bargaining agreement (CBA). Brown admitted at trial, however, that the "job" was not governed by the seniority provisions of the CBA and that Brown could have assigned anyone he wanted, including Plaintiff, to the "forklift job." (J.A. at 123-24.) Brown had also earlier stated that Richard Spears, general chairman of the union, called to complain about Plaintiff performing forklift duties. However, Spears testified at trial that he could not recall making any such complaint to Brown and had no record of such a complaint. Foreman Joiner's testimony was also inconsistent. Although he testified at his deposition that he had not heard complaints from co-workers about Plaintiff driving the forklift, he changed his story at trial, testifying to some complaints.

With the plaintiff's cross-appeal, we examine whether the district court erred when it instructed the jury that the plaintiff had to prove malice or reckless disregard by clear and convincing evidence to recover punitive damages under 42 U.S.C. § 1981(a).

We find that Appellee Sheila White failed to establish a retaliation claim under Title VII. Burlington Northern's transfer of White to a different duty within the same job classification and with the same salary, title and seniority was not an adverse employment action sufficient to sustain a Title VII retaliation claim. Similarly, we find that Burlington Northern's temporary suspension of White was not sufficiently adverse to support a Title VII claim. Since the appellant's actions did not result in a cognizable employment action, we reverse the district court and set aside the jury's verdict. Because we set aside the jury's verdict, the issues concerning the jury instructions and attorney's fees are moot.

## I. Procedural Background

Plaintiff White brought this action and claimed unlawful discrimination based on sex, 42 U.S.C. § 2000e-2 (a)(1), and for unlawful retaliation, 42 U.S.C. § 2000e-3. After a jury trial, the jury found in White's favor on her retaliation claim and against her on her sexual harassment and punitive damages claims. The jury awarded White $43,500.00 in damages on the retaliation claim.

On September 18, 2000, Appellant Burlington Northern filed a motion for judgment as a matter of law or, in the alternative, for a new trial. Burlington Northern argued that Plaintiff White failed to establish retaliation because her changed job duties and temporary suspension were not adverse employment actions within the meaning of Title VII. Burlington Northern also argued that Plaintiff White failed to show that the railroad's asserted legitimate, non-discriminatory reason for transferring her was pretextual. Finally, the railroad claimed that the temporal proximity of

White's EEOC charge and her suspension did not support an inference of retaliation.

On November 16, 2000, the district court denied Burlington Northern's motion for judgment or, in the alternative, for new trial. The district court found that White presented sufficient evidence that her transfer from forklift operator to working on the track was an adverse employment action. In regards to this finding, it relied upon the "indices that might be unique to a particular situation" language of *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999).

The district court also held that White's temporary suspension was an adverse employment action. It found her temporary suspension was an adverse employment action although Burlington Northern had reversed the decision and made White whole within a month. In making this decision, the district court discounted Burlington Northern's reliance on *Dobbs-Weinstein v. Vanderbilt University*, 185 F.3d 542 (6th Cir. 1999). The district court distinguished *Dobbs-Weinstein* because the faculty member there did not suffer immediate suspension, continued working during the appeals process, and the case dealt with the unique situation of tenure in an academic setting.

With respect to Burlington Northern's claim that White had not proven its legitimate, non-retaliatory reason was pretextual, the district court held that the jurors received conflicting evidence that the jury could properly resolve in White's favor. Similarly, the district court held that White presented sufficient evidence for the jurors to determine that Burlington Northern suspended her because of the EEOC charge.

Finally, the district court denied Burlington Northern's motion for a new trial because it did not show that the verdict was against the clear weight of the evidence.

The district court entered an order granting 80% of White's requested attorney's fees. The district court's initial order

**2.    Other Elements in a Title VII Claim**

Although not addressed by the majority, the remaining relevant element necessary for a plaintiff to establish a *prima facie* case of retaliation is a causal connection between the Title VII-protected activity taken by the employee and the adverse employment action taken by the employer. *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 792 (6th Cir. 2000). This Court has held that such a causal connection may be shown through circumstantial evidence, such as a proximity of time between the two events. *See, e.g., Fenton v. HiSAN,* 174 F.3d 827, 832 (6th Cir. 1999) (citing *Moon v. Transp. Drivers, Inc.,* 836 F.2d 226, 229 (6th Cir. 1987)). Most notably, Plaintiff was removed from the forklift job almost immediately after her complaints about Foreman Joiner's sexual harassment and discrimination resulted in his suspension. Then, when Plaintiff filed an EEOC complaint about this retaliatory move, Roadmaster Brown allowed Foreman Sharkey to suspend her, knowing the suspension was unwarranted, only three days after a copy of the EEOC complaint was sent to Brown. Moreover, testimony at trial indicated that Sharkey told Plaintiff that Brown considered her a troublemaker, and Sharkey even admitted that he was not "crazy" about women working at the railroad. Therefore, more than sufficient evidence existed to support a causal connection between Plaintiff's complaints and Defendant's subsequent adverse actions.

After the employee establishes a *prima facie* case of retaliation, the burden shifts to the employer to assert a non-discriminatory reason for the adverse action. *Ford*, 305 F.3d at 553. Once the employer has done so, the burden shifts back to the employee to demonstrate that the asserted reason is a pretext for retaliation. Defendant contends that there was a complete absence of proof as to whether its reasons for the employment decisions were pretextual because Plaintiff failed to rebut the fact that Defendant moved a more senior person to the forklift duties, and that it had received complaints from other senior employees regarding Plaintiff being allowed to operate the forklift as a junior employee.

no pay, this was because the relevant contractual period had lapsed, and she was aware of this possibility several months ahead of time. In the present case, Roadmaster Brown, a senior level employee at the railroad, decided to sustain Foreman Sharkey's suspension, despite his belief that the suspension was not warranted. The suspension was immediate, and Plaintiff's pay and benefits were immediately terminated without warning, pending an investigation. Suddenly, Plaintiff had no income with which to pay her bills, and was left in limbo to await a determination as to her future at the railroad. The adverse nature of the suspension was not reversed simply because she subsequently received retroactive pay. While the fact that Plaintiff was reinstated might have mitigated her damages, it was not dispositive of whether an adverse employment action occurred. *Dobbs-Weinstein* is properly distinguishable, because that case involved not a suspension in an ordinary employment context, but a denial of tenure in an academic setting, which was integral in the Court's holding.

At any rate, even if these employer actions individually were not sufficiently adverse, the conduct in the aggregate created a situation that constituted a materially adverse employment action. Although the majority considered the two actions individually, several employer actions, taken together, may also constitute an adverse employment action. *See Ford v. Gen. Motors Corp.,* 305 F.3d 545, 554 (6th Cir. 2002) (holding that plaintiff's increased workload, heightened scrutiny, and constructive discharge, taken together, constituted materially adverse employment action); *Simas v. First Citizens' Fed. Credit Union,* 170 F.3d 37, 50 (1st Cir. 1999) (holding that several employment actions, "viewed in the aggregate, could be considered 'materially adverse'"). Certainly this Court does not recognize *de minimus* actions to be materially adverse. *See Bowman v. Shawnee State Univ.,* 220 F.3d 456, 462 (6th Cir. 2000). However, the suspension and job change, taken together, were more than *de minimus;* they were materially adverse within the meaning of Title VII.

neglected to award costs and expenses. After White filed a Rule 59(e) motion to amend judgment, the district court entered an amended final judgment awarding attorney's fees and $4,055.28 in costs and expenses.

## II. Factual Background

On June 23, 1997, Burlington Northern hired Sheila White as a maintenance of way track laborer ("track laborer") at the Tennessee Yard in Memphis, Tennessee. Track laborers engage in physically demanding tasks, including maintaining and oiling railway switches, and doing repairs. Before beginning work, Cathy McGee, Burlington Northern's Human Resources Manager, and Marvin Brown, roadmaster of the Tennessee Yard, interviewed White. During her interview, White said that she had extensive prior forklift experience.

Following her hire, Brown directed White to operate the stationary forklift at the Tennessee Yard. Before White's hire, Ralph Ellis carried out these forklift responsibilities at the Tennessee Yard. Besides doing forklift work, Ellis had also worked on a mobile track gang, work that gave him additional per diem pay. After Burlington Northern hired White, Brown gave Ellis the option to continue working on the mobile gang or work on the forklift, but forfeit his per diem rate. Ellis chose to continue working on the mobile gang, thus creating the need to assign an employee to the forklift responsibilities.

White complained that Burlington Northern employees treated her differently because of her sex, female. She alleged that between July 2, 1997, and September 16, 1997, her foreman treated her differently from male employees, and twice made inappropriate remarks. White reported her allegations to Brown, her foreman's supervisor. Brown contacted McGee, and McGee investigated the complaint. As a result of the investigation, Burlington Northern suspended the foreman without pay for ten days on September 26, 1997,

and ordered him to attend a sexual harassment training session.

On the same day, roadmaster Brown reassigned the forklift responsibilities to Ellis, the employee who formerly operated the forklift. Burlington Northern says that Brown assigned Ellis to the forklift operator's position because male employees, senior to White, complained that the railroad gave her preferential treatment because she was female. Specifically, the appellant says these men complained that White, who had less seniority, received the forklift job assignment instead of working full-time on the tracks. The railroad said it first learned of these complaints during its sexual harassment investigation of White's foreman. Brown testified on direct examination that he changed White's job assignment based on complaints from senior employees and because Ellis had greater seniority.

On cross examination, Brown identified the complaining employees as Ralph Ellis, Daryl Knight and Gary Augustus. Ellis and Knight were senior to White. Augustus was junior to Ms. White. Of the three, only Ellis had the qualifications to operate a forklift. During cross examination, Brown testified that he knew of the mens' complaint about White's forklift position before White complained to him about sexual discrimination and harassment. However, Brown did not transfer White until after she complained about sexual discrimination and harassment.

Brown's trial testimony is inconsistent with Burlington Northern's interrogatory response. In that response, the railroad said that it transferred White from the forklift position because a senior employee claimed the job according to the collective bargaining agreement. Burlington Northern also stated that it had concerns about potential repercussions from the Union for giving White, a less senior employee, the forklift responsibilities. But, Brown testified that seniority did not govern the forklift job. Instead, he could place anyone

authority from this Court equating a denial of tenure with a suspension, the majority ignores the *Dobbs-Weinstein* court's underlying reasoning and mistakenly equates the situations based on similar outcomes: reinstatement with back pay.

The majority's use of the dissent in *Dobbs-Weinstein* is misplaced. *See* 185 F.3d at 548. The dissent was speaking mainly in the context of tenure decisions, which as explained earlier, constitute a unique area in Title VII cases because of the nature of those decisions. Therefore, a "timely fashion" in the tenure context differs from that in the more conventional employment context. In other words, an immediate thirty-seven-day suspension for a blue collar worker, who may be living from paycheck to paycheck, can actually have a more severe impact on the worker than a sixty-day lapse for a university professor who had been warned well ahead of time that she would not receive tenure and that her employment contract would expire. The majority, however, again mistakenly equates the tenure denial scenario with that of employment suspensions in non-academic contexts.[3]

Even if one finds the situations appropriate for comparison, there are material differences between *Dobbs-Weinstein* and the present case. The plaintiff in *Dobbs-Weinstein* was on notice that her job contract would not be renewed. Although there was an interim period where she was not working and received

---

[3]The majority has mischaracterized the dissent as saying that a blue-collar worker's suspension results in a more severe impact than a denial of tenure for a university professor. To be clear, the dissent makes no such categorical statement. The majority had suggested that the *Dobbs-Weinstein* dissent supported its contention that Plaintiff's thirty-seven-day wait for reinstatement and back pay paled in comparison to the delay experienced by the *Dobbs-Weinstein* plaintiff, who had to wait over sixty days and was still denied Title VII relief. To the contrary, the point of the dissent is that a delay in the tenure denial context, or the uncertainty experienced by a professor as a result of the non-renewal of an employment contract, should not be equated with the situation of an employee who receives an immediate suspension in a non-academic setting.

cases based on delayed grant of tenure).  The Court also noted that "tenure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally." *Id*. at 545 (citing *Zahorik v. Cornell Univ.,* 729 F.2d 85, 92-93 (2d Cir. 1984)).  Such considerations included the following:

> the lifetime nature of the contract, the fact that the decisions are often non-competitive, the decentralized nature of the decision-making process, the multiplicity of facts in the decision, the fact that tenure decisions are often quite contentious, and the reluctancy of courts to review the merits of a tenure decision.

*Id*. (citing *Zahorik,* 729 F.2d at 92-93).  The Court further explained, "Because tenure decisions are so complex and potentially contentious, universities are well-served to have a grievance procedure for individuals wishing to appeal any of the many intermediate decisions or evaluations made during the tenure review process." *Id*.[2]

The majority's opinion implies that *Dobbs-Weinstein* stands for the proposition that subsequent reinstatement with back pay vitiates any earlier wrong a plaintiff may have suffered.  If this is what *Dobbs-Weinstein* intended to hold, it could have done so simply enough.  Instead, it explained that tenure decisions present a complex set of challenges that justify a mechanism designed to reverse earlier erroneous tenure decisions.  Therefore, the initial decision of the dean not to concur in recommending the plaintiff for tenure was not a final decision upon which the plaintiff could base an adverse employment action, even though her contract terminated and she was out of work during part of the review process.  Despite the lack of

---

[2]Other circuits also have acknowledged the unique nature of tenure decisions.  *See Tanik v. S. Methodist Univ.,* 116 F.3d 775, 776 (5th Cir. 1997); *Brousard-Norcross v. Augustana Coll. Ass'n,* 935 F.2d 974, 976 (8th Cir. 1991); *Kumar v. Bd. of Trs., Univ. of Mass.,* 774 F.2d 1, 11 (1st Cir. 1985); *Zahorik,* 729 F.2d at 92-93 (2d Cir. 1984).

in that position.  In addition, neither the union, nor anyone else, filed a grievance about White's operation of the forklift.

On October 10, 1997, White filed a discrimination charge with the EEOC alleging sexual discrimination and retaliation.  On December 4, 1997, she filed a second charge of discrimination with the EEOC alleging retaliation.  In her second EEOC filing, White alleged that Brown had placed her under surveillance and checked on her daily activities.  The EEOC mailed the charge of discrimination to Brown on December 8, 1997.

On December 11, 1997, Percy Sharkey, White's foreman, removed White from service for insubordination.  On that day, White and her track gang were working in Blytheville, Arkansas supporting a regional tie gang.  At trial, Sharkey testified that he directed another employee to ride with him in his truck because he wanted that employee to help him with some heavy lifting.  Sharkey assigned White to ride in another truck with another foreman. She refused, claiming that she had seniority over the employee accompanying Sharkey.

As a foreman, Sharkey could remove White from service for insubordination pending a full investigation.  Before removing White from service for insubordination, Sharkey unsuccessfully tried to reach his immediate roadmaster.  He then called Brown for advice.  At Brown's request, Sharkey wrote a description of the incident and faxed it to Brown.  After reviewing Sharkey's written statement, Brown told Sharkey that White's conduct justified her removal from

service.[2]    At trial, Sharkey testified that Brown told him to pull her out of service for insubordination.[3]

Once Burlington Northern removed her from service, White and her union filed a grievance for her suspension. Under the terms of the union contract, if White did not file a grievance within fifteen days of her removal, the railroad could have fired her. In response to the grievance, Burlington Northern conducted an internal investigation. After investigating the grievance, Burlington Northern concluded that Sharkey overreacted and that White's conduct was not insubordination. On January 16, 1998, the railroad reinstated White to full service with all back pay, including overtime pay and benefits that she was entitled to during the suspension. This made her whole.

---

[2]Brown testified at trial:

After I reviewed this document, I told Mr. [Sharkey] that according to what he had wrote in this document that she was being insubordinate and if he felt that she was being insubordinate and she continued to refuse to do what he said, to pull her out of service for insubordination, and we would – pending an internal investigation through the organization, and that's it.

(Brown Trial Test., J.A at 108).

[3]White testified at trial:

[S]o after we loaded the plates, he decided to go back to the toolhouse and make a phone call, and he called Memphis and he came back out to the truck and told me that I was – suspended, insubordinate, I can hardly say that word, but suspended, and he told me Brown told him to send me home, back to Memphis.

(White Trial Test., J.A. at 210).

*Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir. 1994). Simply stated, Plaintiff's reassignment from a forklift operator to a track laborer involved material alterations of Plaintiff's job responsibilities thus constituting an adverse employment action for purposes of establishing a *prima facie* case of retaliation under Title VII. *See Hollins*, 188 F.3d at 662.

### b.    *Thirty-seven Day Suspension*

Plaintiff's thirty-seven day suspension constituted an adverse employment action as well. First of all, there is authority in this Circuit that a temporary suspension can amount to an adverse employment action. In *Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001), this Court held that the plaintiff suffered an adverse employment action when he was suspended without pay for fourteen days and did not receive back pay. On the other hand, as the majority notes, a temporary suspension with pay is not an adverse employment action. *See Jackson v. City of Columbus*, 194 F.3d 737, 752 (6th Cir. 1999). The unresolved question for purposes of this case is whether a suspension without pay, coupled with a subsequent reinstatement and back pay, should be classified as an adverse employment action.

The majority claims this question was answered by the reasoning of *Dobbs-Weinstein,* because the plaintiff in that case received all back pay during the time she was not working for the university, and therefore was "made whole." However, it is apparent that key to this Court's decision in finding no adverse employment action was that the situation involved a denial of tenure. *Dobbs-Weinstein*, 185 F.3d at 545-46. Indeed, the Court relied primarily on tenure decisions in making its determination.[1] *Id.* at 546 (citing several district courts that had reached similar conclusions in discrimination

---

[1]Contrary to the majority's assertion, the dissent does not claim that *Dobbs-Weinstein* relied *exclusively* on tenure decisions, but that it relied *primarily* on them.

in effect, experienced not a mere "lateral transfer," as the majority states, but a demotion, because, for the same pay, her work became much more strenuous. As Plaintiff testified, track labor required more physical exertion and was "much dirtier" than the forklift job. (J.A. at 201.) Some of the dirty aspects of the job include "picking up tools, oiling them from down on the ground where sometimes it require[d] you to get on your knees and hands." (J.A. at 202.) Adverse aspects also included prolonged sun exposure.

The majority asserts that under *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886-87 (6th Cir. 1996), job reassignments that include some increased physical labor are not sufficient to constitute an adverse employment action. *Kocsis*, however, is distinguishable from the matter at hand inasmuch as unlike in *Kocsis,* where the duties of the plaintiff nurse increased only with respect to the "frequency [of] lifting and maneuvering residents," *id.* at 879-80, Plaintiff's reassignment to the track laborer position involved an increase in the frequency of objects lifted as well as an increase in the weight of the objects lifted. Furthermore, Plaintiff's work as a track laborer required that she be exposed to the sun more often than before, and involved much dirtier work than her previous position as a forklift operator. Therefore, the increased physical demands brought about by the reassignment of Plaintiff to the track laborer position went well beyond that of the increased physical demands experienced by the plaintiff in *Kocsis*, and went well beyond a "mere inconvenience" as described in *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999). Similarly, Plaintiff's reassignment to the track laborer position did not constitute an ordinary lateral job transfer, thus taking this case out of the reach of those cases finding that a lateral transfer does not constitute an adverse employment action. *See Policastro v. Northwest Airlines,* 297 F.3d 535, 540 (6th Cir. 2002); *Darnell v. Campbell County Fiscal Court,* 731 F.Supp. 1309, 1313-14 (E.D. Ky. 1990); *see also Bradford v. Norfolk S. Corp.,* 54 F.3d 1412, 1420 (8th Cir. 1995); *Flaherty v. Gas Res. Inst.,* 31 F.3d 451, 457 (7th Cir. 1994); *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 (9th Cir. 1994);

### III. Argument

#### A. Motion as a Matter of Law

##### 1. Standard of Review

We review *de novo* the district court's denial of a Rule 50(b) motion for judgment as a matter of law. *Smith v. Legget Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000). We grant the motion only if, in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could only find in favor of the moving party. *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001). In making our determination, we review all of the evidence in the record, drawing all reasonable inferences in favor of the non-moving party, making no credibility determinations, and weighing no evidence. *Id.* at 600 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)).

Besides this standard, *Reeves* directs courts to "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 150. Further, we give credence to the evidence favoring the non-movant, as well as that evidence supporting the moving party that is uncontradicted and unimpeached, where the evidence comes from disinterested witnesses. *Id.* Finally, the jury is entitled to treat a party's dishonesty about a material fact as evidence of culpability. *Id.* at 147, 154.

##### 2. Elements of Title VII Retaliation Claim

Title VII prohibits retaliation by an employer where an individual has engaged in protected activity. 42 U.S.C § 2000e-3(a). The anti-retaliation provision provides in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an

unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

A plaintiff can establish retaliation under Title VII without proof by direct evidence. In such cases, we have adopted the burden shifting approach initially identified in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Hollins v. Atl. Co.*, 188 F.3d. 652, 658 (6th Cir. 1998).

Under this standard, White must first establish a prima facie case of retaliation. She must show: 1) she engaged in an activity protected by Title VII; 2) the defendant knew of the exercise of her civil rights; 3) the defendant took an employment action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the adverse employment action. *Hollins*, 188 F.3d at 661 (citing *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 877 (6th Cir. 1991)).

If White establishes a prima facie case of retaliation, the burden of production shifts to Burlington Northern to articulate a legitimate, non-discriminatory reason for taking the adverse employment action. Burlington Northern's burden is one "of producing an explanation to rebut the prima facie case--i.e., the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citation omitted). Once the employer produces such evidence, the burden shifts to the plaintiff to show that the reasons the employer offered were a pretext for retaliation. *See id*. The plaintiff at all times retains the burden of persuading the trier of fact that the employer intentionally retaliated in violation of Title VII. *See id*. at 507–08.

Sharkey suspended Plaintiff for insubordination, and even after Brown determined that Sharkey had overreacted and even though Brown could have reversed Sharkey's decision, he declined to do so. Instead, Plaintiff filed a grievance with the union, a full internal investigation ensued, and a hearing officer determined what Roadmaster Brown knew all along–that Sharkey had overreacted and that Plaintiff did not commit insubordination. Meanwhile, Plaintiff's co-worker, Greg Nelson, who arguably was the most disobedient in the entire incident, was not suspended or disciplined in any manner for failing to follow Sharkey's orders.

## 1. Adverse Employment Action

Like the majority, I recognize that this Court requires a materially adverse employment action for a plaintiff to state a *prima facie* case of Title VII retaliation. Unlike the majority, however, I believe that Plaintiff satisfied her requirement in that regard. In view of the facts and circumstances, Plaintiff's effective demotion and subsequent suspension, even with reinstatement with back pay, together constituted the requisite materially adverse employment action.

### a. *Removal from the Forklift Position*

With regard to Roadmaster Brown's removal of Plaintiff from the forklift job, I disagree with the majority's acceptance of Defendant's slant on the facts. Although it is true that Plaintiff was initially hired as a track laborer, and she sometimes performed other duties because operating the forklift, in the words of Defendant, "was not a fulltime job" (Defendant's Br. at 5), Defendant has mischaracterized the forklift job as a happenstance duty to be farmed out to employees in a random fashion. In fact, the forklift job was not merely an occasional task; it was an actual job which, according to Roadmaster Brown's own testimony, was advertised to the railroad employees. When Roadmaster Brown took Plaintiff off the forklift, he did not merely reshuffle her responsibilities; he took away her job. Plaintiff,

_____

**DISSENT**

_____

CLAY, Circuit Judge, dissenting.    The majority has determined that in light of *Dobbs-Weinstein v. Vanderbilt University*, 185 F.3d 542 (6th Cir. 1999), Defendant did not take materially adverse employment action by removing Plaintiff from her position, assigning her more arduous work, and suspending her without pay for thirty-seven days before the suspension was later reversed with back pay.  Because the majority's opinion is not supported by our precedent or the record below, I respectfully dissent.

Plaintiff began working for Defendant on June 23, 1997 as a track laborer, but Roadmaster Brown testified that he decided to offer her a position operating a forklift.  As a forklift operator, Plaintiff performed other duties, but this was because her primary duty of operating the forklift did not take all day.  Plaintiff subsequently submitted an internal complaint about the sexual harassment of her by Foreman Bill Joiner.  On the very day that Plaintiff was notified of Joiner's suspension for the sexual harassment, Brown transferred Plaintiff from her forklift operator job to other track laborer duties full-time, despite a lack of complaints about her performance on the forklift.  The transfer was allegedly due to complaints from other workers that Plaintiff was not sufficiently senior for the forklift position.  Yet Brown replaced Plaintiff with Ralph Ellis, the man who earlier had voluntarily given up the forklift, and who did not complain about Plaintiff being given the job.  No other qualified workers senior to Plaintiff were available to run the forklift.

After Plaintiff was removed from the forklift position, she filed two EEOC complaints, alleging, among other things, that the removal was in retaliation for the sexual harassment complaint she had filed.  Only three days after a copy of the second complaint was sent to Roadmaster Brown, Foreman

### 3.  Adverse Employment Action

On appeal, Burlington Northern says White did not establish that the reassignment of the forklift responsibilities and her temporary suspension were "adverse employment actions."

"[A] plaintiff must identify a materially adverse change in the terms and conditions of his employment to state a claim for retaliation under Title VII."  *Hollins*, 188 F.3d at 662 (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) and *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)).  A material adverse change includes a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.  *See Kocsis*, 97 F.3d at 886 (adopting factors described in *Crady*, 993 F.3d at 136); *see also Hollins*, 188 F.3d at 662.  Importantly, a change in employment conditions "'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  *Kocsis*, 97 F.3d at 886 (quoting *Crady*, 993 F.3d at 136).

#### a.  Forklift Operation Issue

Burlington Northern says White did not suffer an adverse employment action when Brown took her off forklift duty because this reassignment was a non-actionable lateral job transfer.

We have stated that "[r]eassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims."  *Kocsis*, 97 F.3d at 885.  Further, we have held that where a job transfer has the same duties, pay, and grade level but requires an additional 20-minute commute, the plaintiff did not satisfy the adverse employment action element.  *Darnell v. Campbell County Fiscal Court*, 731 F. Supp. 1309, 1313

(E. D. Ky. 1990), *aff'd,* 924 F.2d 1057 (6th Cir. 1991). Finally, we have held that a sales representative did not suffer an adverse employment action when her employer reassigned her to territory 80 to 100 miles from her home where she had previously worked the same territory between 30% and 40% of the time. *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002).

Other courts have also held that a lateral job transfer is usually not an adverse employment action.  *See, e.g., Bradford v. Norfolk S. Corp.*, 54 F.3d 1412, 1420 (8th Cir. 1995) (job transfer with poor working conditions was not an adverse employment action); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir. 1994) (job transfer without loss in salary benefits or responsibilities was not adverse action though the plaintiff had to report to a former subordinate); *Murphy v. Yellow Freight Sys., Inc.*, 832 F. Supp. 1543, 1550-51 (N.D. Ga. 1993) (no adverse employment action found where plaintiff did not receive as high of a pay raise as she thought she deserved, she received night and weekend shifts where that was a normal alternating assignment for all employees, employer told her that her clothing violated the company's dress code, and plaintiff complained that her supervisor documented their conversations in writing and put his notes in her personnel file); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994), *cert. denied*, 115 S. Ct. 733 (1995) (transferring female employee to another shift was not an adverse employment action); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994) (reassigning plaintiff to more stressful job was not an adverse action).

Finally other courts have noted that a plaintiff's subjective perception that one position is more desirable than another is not controlling. *Kelleher v. Flawn*, 761 F.2d 1079, 1086 (5th Cir. 1985).

Here, Burlington Northern argues that White's reassignment to track labor duties did not materially

Because White did not show the required prima facie elements of retaliation, this issue is moot.

### IV. Conclusion

We find that the appellant's transfer of Sheila White to a different duty within her same job classification was not an adverse employment action sufficient to support a Title VII claim.  Similarly, we find that the appellant's temporary suspension of White, a suspension that it soon overturned with back pay, was also not an adverse employment action sufficient to support a Title VII claim.  Since White does not show an adverse employment action, she fails to make out a prima facie case.  We therefore reverse the district court and set aside the jury's verdict.  Because we set aside the jury's verdict, the issues concerning the jury instructions and attorney's fees are moot. The judgment of the U.S. District Court for the Western District of Tennessee in case 00-6780 and 01-5024 is REVERSED in part, and REMANDED to set aside the jury verdict.

tenure case as support for our conclusion that a Title VII plaintiff must suffer an 'ultimate employment decision.' *Dobbs-Weinstein*, 185 F.3d at 545 (stating "we are not alone in focusing on whether Dobbs-Weinstein can present a case based on an 'ultimate employment decision' and citing *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (postal discrimination case)).

Finally, we also disagree with the dissent's assertion that a suspension for a university professor does not have as severe an impact as a suspension for a blue collar employee. The dissent ignores the adverse impact that a suspension or denial of tenure has on a professor's academic reputation. This reputational consequence, which exists to a lesser degree in the blue collar setting, can be more damaging in the long-term to a university professor than a temporary suspension for a blue collar worker. Accordingly, we find that White failed to show an adverse employment action sufficient to make out a Title VII retaliation claim.

### 4. Legal Sufficiency of the Evidence

Next, Burlington Northern says that the jury had insufficient evidence to find in favor of White on her retaliation claim. Since we find that White did not meet her prima facie case of retaliation, this issue is moot.

### B. Attorney's Fees

Again, because we hold that White did not present sufficient evidence that she suffered an adverse employment action, the attorney's fee issue is moot.

### C. Jury Instructions on Punitive Damages

On cross-appeal, White says that the district court erred when it instructed the jury that "[p]unitive damages may be considered if and only if, the plaintiff has shown by clear and convincing evidence that a defendant has acted either intentionally, recklessly, maliciously, or fraudulently."

disadvantage White. First, White maintained her position as a track laborer throughout her employment with the railroad. Even when assigned responsibility for operating the forklift, White also worked on track maintenance tasks. Further, White never suffered a termination, a demotion evidenced by a wage or salary decrease, a less distinguished job title, a material loss of benefits, or significantly diminished material responsibilities.

White does not dispute that most lateral transfers are not adverse employment actions. Instead, she says the district court properly found that White suffered an adverse employment action because of the "unique circumstances" language in *Hollins*.[4] 188 F.3d at 662 (quoting the *Crady* factor that a materially adverse change in employment might be indicated by "other indices that might be unique to a particular situation"). Specifically, the district court held that White presented sufficient evidence to show that Brown's reassignment of her to the physically demanding track work

---

[4]The district court's opinion on this issue reads as follows:

Plaintiff presented sufficient evidence to support a finding that moving Plaintiff from operating a forklift to working on the track constituted an adverse employment action. This situation is covered by the "indices that might be unique to a particular situation" language of *Hollins v. Atlantice Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). Plaintiff offered sufficient proof for the jury to find that the unique circumstances surrounding Plaintiff's change in job duties from operating the forklift to working on the track constituted an adverse employment action under the relevant case law. In particular, evidence presented at trial supported a finding that the job responsibilities involved with operating a forklift were light while those responsibilities involved in working on the track were quite heavy and physically demanding. The "unique circumstances" language of *Hollins* applies to these facts, and Defendant has argued no persuasive reason why plaintiff's proof at trial is insufficient to support the jury's finding.

(J.A. at 70–71).

from the light forklift duty was an adverse action. White also contends that finding "Brown's action to transfer Ms. White does not qualify as an adverse employment action would have a chilling effect on reporting discrimination."

We disagree. The fact that forklift duty is less physically demanding than track maintenance work does not make White's reassignment a cognizable adverse employment action. The railroad hired White as a track maintenance worker. One of her explicit job responsibilities was to maintain the railroad tracks. We fail to see how White suffered an adverse employment action by being directed to do a job duty for which Burlington Northern hired her. Moreover, contrary to the dissent's assertion, a job transfer that involves heavy lifting and more physically demanding tasks is not a demotion. In fact, in a disability discrimination case, we held that a nurse's reassignment from a nurse supervisor position to a unit nurse position was not a materially adverse change in employment although the new duties involved more physically demanding tasks. We made this holding because the nurse did not lose any pay, benefits, or prestige. *Koscis*, 97 F.3d at 886-87. We find *Koscis* applicable here because cases involving disability and age discrimination are instructive in Title VII cases. *Kocsis*, 97 F.3d at 885.

Therefore, we find that White's reassignment away from forklift responsibilities is not an adverse employment action.

### b. Removal From Service

Next, Burlington Northern says that the district court erred when it found that White's suspension constituted an adverse employment action. Burlington Northern argues that White's suspension was not the final employment decision required for an adverse employment action because the railroad reinstated White with full back pay, including overtime pay, and full benefits. Burlington Northern primarily relies on

becoming final. The dissent in *Dobbs-Weinstein* supports this position:

> Unlike the majority, I am not concerned that permitting Dobbs-Weinstein to go forward with her action will encourage premature litigation concerning adverse initial employment decisions. *As long as an employer's appeal or grievance process operates in a timely fashion, the employee generally will not suffer a materially adverse action. This is particularly true if the employer refrains from terminating the employee in the interim, but, even if the employee is wrongfully terminated, voluntary reinstatement and provision of back pay will limit or possibly even obviate the recovery of compensatory damages.*

*Id.* at 548 (Moore, J., dissenting) (emphasis added).

The cases White cites in support of her contention that temporary suspensions are adverse employment actions are distinguishable. The employer upheld all of the suspensions in those cases. *See Gribcheck v. Runyon*, 245 F.3d 547, 549 (6th Cir. 2001) (upholding fourteen day suspension); *McKethan-Jones v. Ohio Dept. of Health*, 2001 WL 345782 (6th Cir. Mar. 27, 2001); *Dowell v. Rubin*, 234 F.3d 1268 (6th Cir. Oct. 31, 2000) (upholding five day suspension without pay). Therefore, the employee did not recover lost wages and benefits.

White's final argument is that *Dobbs-Weinstein* is limited to academic tenure cases. We disagree. In fact, we cited to *Dobbs-Weinstein* in a racial discrimination claim outside the tenure setting, for the proposition that a police chief did not suffer an adverse employment action where he suffered no "final or lasting harm." *See Jackson*, 194 F.3d at 752.

Additionally, the dissent says that *Dobbs-Weinstein* is inapplicable outside the tenure setting because we relied exclusively on tenure decisions in making our determination in *Dobbs-Weinstein*. Again, we disagree. In fact, we cited a non-

university notified the professor of the tenure denial, it also informed the professor of her termination, effective at the end of the academic year. The fact that the *Dobbs-Weinstein* plaintiff bore the onus of initiating the review process did not alter our conclusion there that the professor had not suffered an adverse employment action. We fail to see why the result should be any different here. Further, the employment action complained of must be "the ultimate employment decision." Here, the review process resulted in White's reinstatement. Therefore, her suspension was not "the ultimate employment decision."

More important, the *Dobbs-Weinstein* professor did lose pay for approximately three months from August, 31, 1995 to November 1995. *Dobbs-Weinstein*, 185 F.3d at 544 (noting that in November 1995 after the university reversed the tenure denial, the professor "was given full pay for the period after August 31, 1995, when payment for her previous contract had ended."). Following the tenure denial, the professor's appointment expired in August 1995, the end of the academic year. The university reversed the denial of the tenure in November 1995. Therefore, the *Dobbs-Weinstein* plaintiff received no pay from the university for three months. Yet, we found that the reinstatement with back pay and benefits stopped the original tenure decision from being an adverse employment action.

Additionally, the district court's reasoning ignores the inescapable fact that Burlington Northern ultimately reversed White's suspension and reinstated her with full back pay and overtime. Burlington Northern's suspension of White was the first step in the employment decision making process. But, it was only an interim decision. The railroad had a grievance process available to challenge such decisions. The internal investigation was the next step in the chain. The railroad timely completed this investigation and reinstated White with full back pay and benefits thirty-seven days after her suspension. Therefore, White's appeal of her suspension prevented Burlington Northern's interim decision from

*Dobbs-Weinstein v. Vanderbilt University* as support for this proposition.

In *Dobbs-Weinstein*[5] we held that a suspension was not an adverse employment action. *Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 545–46 (6th Cir. 1999). Moreover, a reinstatement which puts the plaintiff in the position she would have been in absent the suspension, constitutes the "ultimate employment decision" thereby negating a potentially adverse intermediate employment decision. *Id.*

In *Dobbs-Weinstein*, a professor sued Vanderbilt University under Title VII for an allegedly discriminatory denial of tenure. *Id.* at 543-44. The philosophy department initially recommended tenure be given, but the Dean rejected the department's recommendation, and denied plaintiff's tenure. *Id.* at 543. Through an internal grievance process, Vanderbilt reversed the Dean's decision. *Id.* at 544. The university promoted plaintiff to associate professor with tenure retroactive to the date the Dean should have granted tenure. *Id.* The university also gave the professor all back pay retroactive to the date the Dean should have promoted her. *Id.* Despite the favorable result she received, the professor sued Vanderbilt for the interim emotional distress she suffered, potential damage to her reputation, and interest on the back pay. *Id.*

The trial court in *Dobbs-Weinstein* granted the defendant summary judgment, and this Court affirmed. *Id.* at 545. Although the review process of the tenure denial lasted eighteen months, this Court held that the professor was not

---

[5] In relying on *Dobbs-Weinstein,* we note that it involved a discrimination claim, not a retaliation claim. Both claims, however, share a common element, "adverse employment action." Moreover, in *Hollins*, a retaliation case, we set forth the factors to use in an adverse employment action case after borrowing these factors from an age discrimination case and a disability discrimination case. Therefore, we conclude that *Dobbs-Weinstein* is applicable here.

entitled to recover because she did not suffer an ultimate adverse employment decision as the university ultimately gave tenure. *Id*. at 545-46; *see also Jackson v. City of Columbus*, 194 F.3d 737, 752 (6th Cir. 1999) (holding that the thirty-day suspension of an African-American police chief did not constitute an adverse employment action because the decision did not ultimately constitute "a termination of employment, a change in salary, demotion, loss of benefits, decreased work hours, or significantly diminished material responsibilities."). We reasoned that employees should not challenge intermediate employment decisions when the ultimate employment decision is not adverse to the plaintiff. *Dobbs-Weinstein*, 185 F.3d at 546. We further elaborated:

> Dobbs-Weinstein has not created a claim for employment discrimination by suing Vanderbilt before the final decision on her promotion and tenure was made. She argues that her claims for emotional distress and professional reputation damages mean that her claim is viable, but that argument places the cart before the horse. A claim for potentially recoverable damages does not transform Venable's decision into an "adverse employment action." *Dobbs-Weinstein succeeded in the grievance process, and Vanderbilt's final decision was to grant her tenure. She has not here suffered a final or lasting adverse employment action sufficient to create a prima facie case of employment discrimination under Title VII.* To rule otherwise would be to encourage litigation before the employer has an opportunity to correct through internal grievance procedures any wrong it may have committed.

*Id.* (emphasis added).

Other courts have also held that an adverse employment action must be based on an "ultimate employment decision" by an employer. *See, e.g., Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997), *cert. denied,* 522 U.S. 932 (1997); *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.) (*en*

*banc*), *cert. denied*, 454 U.S. 892, 102 S. Ct. 388 (1981) (holding that Title VII prohibits only "ultimate employment decisions" which are retaliatory and not "interlocutory or mediate decisions."); *see also Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 755 (4th Cir.), *cert. denied*, 117 S. Ct. 70 (1996).

The district court sought to distinguish *Dobbs-Weinstein.* The district court noted that the *Dobbs-Weinstein* professor never stopped working and never suffered a break in payment.[6] Here, White lost all pay and benefits immediately upon her suspension. The district court also found crucial the fact that White faced permanent termination in contrast to the professor.

We reject these arguments. First, although the professor continued to work during the appeals process, she did lose the increased pay and benefits associated with tenure. In fact, when the university granted the professor's tenure, it also gave her retroactive back pay to the date that it should have granted tenure. This period was 18 months long. By contrast, White waited only thirty-seven days before the railroad reinstated her and gave her back pay. We also reject White's arguments that the fact that her suspension occurred during the Christmas holiday season makes her suspension unique. White misplaces this argument. While emotional injuries may be affected by the season, it does not make the suspension a sufficiently adverse employment action.

We also note that contrary to the district court's assertion, the *Dobbs-Weinstein* plaintiff also faced termination if she did not affirmatively appeal the tenure denial. At the time the

---

[6]The district court explained that "[w]hereas the plaintiff in *Dobbs-Weinstein* was initially informed that her tenure had been denied and that her contract would not be renewed at the end of the year, Plaintiff in the present case was immediately suspended without pay. There is a marked difference between being told that employment will cease in a couple of months and being immediately suspended indefinitely without pay or other benefits." (J.A. at 72).