**Linda PORTER, et al., Plaintiffs,**

**v.**

**Ken ROOSA, et al., Defendants.**

**No. C–3–01–466.**

United States District Court,
S.D. Ohio,
Western Division.

Jan. 14, 2003.

Paul Roger Leonard, Dayton, OH, Harold Robert Farquhar, Dayton, OH, for plaintiffs.

Lawrence Francis Feheley, Thomas Walter Hill, Kegler Brown Hill & Ritter, Columbus, OH, for defendants.

DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF LINDA PORTER (DOC. #25) AND SUSTAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF LISA NICOLOSI (DOC. #24); JUDGMENT ON PLAINTIFF LISA NICOLOSI'S CAUSE OF ACTION TO ENTER IN FAVOR OF DEFENDANTS AND AGAINST PLAINTIFF; PLAINTIFF LINDA PORTER'S CAUSE OF ACTION TO BE REMANDED TO STATE COURT FOR LACK OF SUBJECT MATTER JURISDICTION; TERMINATION ENTRY

RICE, Chief Judge.

The Plaintiffs in this case are Linda Porter and Lisa Nicolosi, two former employees of the McDonald's Corporation ("McDonald's"). The Defendants are McDonald's itself, and Ken Roosa and Anita Patton, who were also employed by McDonald's at all relevant times. Where no confusion will result, the Court will refer to the Defendants collectively as "McDonald's." The Plaintiffs plead, in their Amended Complaint (Doc. #18), the following four claims: (1) promissory estoppel (Count One; stated by both Plaintiffs); (2) negligence (Count Two; stated by both Plaintiffs); (3) retaliation in violation of the public policy of the State of Ohio (Count Three; stated by Nicolosi only); and (4) retaliation in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.* ("FLSA") (Count Four; stated by Nicolosi only). The Plaintiffs filed their original Complaint (attached to Doc. #1) in the Common Pleas Court of Montgomery County, Ohio. McDonald's removed same on the basis that this Court 'could assume original subject matter jurisdiction of the entire case because of the presence

of the FLSA claim (plead as Count One in the original Complaint) (Doc. # 1). *See* 28 U.S.C. §§ 1331 & 1441(a) & (c).

The Defendants now move for summary judgment. Because the material facts related to each Plaintiff are, for the most part, distinct, the Defendants have filed separate Motions for Summary Judgment with respect to the claims of Porter (Doc. # 25) and Nicolosi (Doc. # 24). For the reasons which follow, the Motion stated against Porter will be overruled, and her claims remanded, on account of the Court's lack of subject matter jurisdiction. The Motion stated against Nicolosi will be sustained.

## I. *Background Facts* [1]

Porter was hired by McDonald's in 1983 as a crew person. (Porter Aff. (Doc. # 33 at Ex. 1) ¶ 2.) She was promoted to the position of Second Assistant in 1987, and then to First Assistant in 1990. (*Id.*) She left the employ of McDonald's in 1994, but returned as a First Assistant in 1999. (*Id.* ¶ 3.) In May, 2000, she became the manager of the Sugarcreek Plaza McDonald's restaurant, in Centerville, Ohio. (*Id.*)

Nicolosi was hired by McDonald's in 1997 as a crew person at the Stroop Road McDonald's restaurant, in Kettering, Ohio. (Nicolosi Aff. (Doc. # 34 at Ex. 1) ¶ 1.) In August of 1999, she was promoted to the position of Swing Manager. (*Id.*) A year later, she was transferred to the Sugarcreek Plaza restaurant, where she continued in the post of Swing Manager, under the supervision of Porter. (*Id.*) Prior to the events giving rise to the present litigation, Nicolosi had always received stellar marks for her work, received regular merit increases, and was placed in an accelerated management training program. (*Id.* ¶ 2.) In December of 2000, Nicolosi was promot-

ed further to the position of Second Assistant Manager. (*Id.* ¶ 3.)

Porter was suspended on April 16, 2001, for violating McDonald's policy on the employment of minors ("policy on minors"), and for using profanity. (Porter Aff. ¶ 4.) Prior to that time, Porter had been disciplined by McDonald's only once, back in 1992, when she received a reprimand for working after store closing hours. (*Id.* ¶ 5.) Up to that point, she had always received positive performance marks. (*Id.* ¶ 6.) The events leading up to her employment of the minor which led to her suspension were spurred by a staff shortage at the Sugarcreek Plaza restaurant. (*Id.* ¶ 11.) On April 5, 2001, unable to persuade any other existing McDonald's employees, be they her own or from other restaurants, to fill the shortages at her restaurant, and informed by her superior, Randy McCray, that she was not to bother him with her staff problems and that she was simply to do what she had to do to keep her restaurant open, she, along with one of her Swing Managers, Deb Forsythe, hired a minor, Jeremy Lamb, to work on April 6. (*Id.* ¶¶ 11, 12, 13, 15 & 16.) Forsythe was not disciplined for her role in the scheduling of Lamb, nor was Lamb's mother, Sally Lamb, who worked as a floor supervisor at McDonald's. (*Id.* ¶ 13.)

At a "termination meeting" on April 20, 2001, Porter was confronted by Roosa and Patton with "termination papers," which she refused to sign. (*Id.* ¶ 18.) She was prevented from asking any questions or presenting her side of the story. (*Id.*)

Prior to her suspension and termination, Porter was unaware of any regular employee or manager of McDonald's being disciplined for using profanity or violating the policy on minors, even though the do-

---

**1.** For purposes of ruling on the Defendants' Motions for Summary Judgment, the Court will construe the facts, and all reasonable inferences drawn therefrom, in the light most favorable to the Plaintiffs, who are the non-moving parties.

ing of both was common at McDonald's. (*Id.* ¶¶ 9, 10 & 17.) In fact, Porter had reprimanded others for violating the policy on minors and had reported such to her superiors, including McCray and Roosa, who responded by saying that they "did not want to hear about it." (*Id.* ¶ 15.) Another former McDonald's employee and Shift Manager, Donna Price, also states that the use of profanity was common at McDonald's during her three years with the company, but that Porter is the only person of whom she is aware who that was actually terminated for swearing. (Price Aff. (Doc. # 33 at Ex. 4) ¶ 5.) Price also states that Porter is the only person of whom she is aware that was ever terminated for violating the policy on minors. (*Id.* ¶ 4.)

Subsequent to Porter's termination, Nicolosi began gathering documentation to present to upper level management for purposes of demonstrating that the violations for which Porter had purportedly been discharged were commonplace at McDonald's and that no one else had ever been terminated for such. (Nicolosi Aff. ¶ 5.) She discussed her findings and concerns with other restaurant managers and with upper level management, including Patton and Roosa. (*Id.* ¶¶ 5 & 6.) On April 22, 2001, Nicolosi prepared a memorandum for presentation to, among others, Roosa and Patton. (*Id.* ¶ 7.) The memorandum stated:

> To Whom it May Concern:
>
> The downfall of many a great leader is the underestimation of the people they lead. Never assume ignorance or stupidity in those who follow you, because it is in your shadow that they are molded.
>
> You are a leader of a great empire. A corporation that is in itself a way of living, a culture, a society completely like no other. This position brings with it a great amount of power, yet a great amount of responsibility as well. A re-

sponsibility to your people to not abuse your power. A promise to be fair, consistent, and unbiased. To provide guidance and direction. When you fail to do so, you lose the very thing that made you a leader: respect.

> Yet this loss can be repaired. One who is not big enough to admit an error and correct it leads nothing at all. And one who makes a decision and is not prepared to carry through with a choice in a consistent and fair manner is a fool.
>
> So here is the test. You have been kindly provided with all of the information necessary to challenge yourself to a true test of character. You have been given the tools to look within yourself and see what lies beneath; in terms of morality, and fairness. Find what truly makes you a leader.
>
> You are free to do with the information I have provided in any way you please. You may ignore it, and see how you feel about yourself and your ethics. You may try to admit a wrong you may have committed, and correct it. You may try to be fair and treat this in the same manner as the prior.
>
> Whatever you choose, I hope you think long and hard about the lesson within, on so many different levels.
>
> But consider this your red flag, because you have officially been "made aware of the situation."
>
> And be at peace with your decision on how to handle this, because I have a decision to make about how I will handle it as well, and they may not coincide.

In a postscript, she added:

> One who is loyal to what they love to the end means that they will not be idle. The ability to point out an error despite the consequences for the good of the whole and the progress of its people

displays a loyalty far exceeding those who sit and watch.

(Doc. # 34 at Ex. 2.)

Attached to this memorandum were certain documents which Nicolosi apparently discovered or assembled as part of her "investigation" into other infractions which did not result in the type of discipline meted out upon Porter. (Nicolosi Aff. ¶ 7; Doc. # 34 at Ex. 2.)[2] The attachments include what purports to be a record that at least one employee had been paid less than minimum wage on one occasion and a written bulletin from a shift manager in which a certain expletive is used to describe, in a critical manner, the unkempt condition of the restaurant floor, as it had been left by the "closing" crew on the previous evening. (Nicolosi also purports that certain other attachments highlight the existence of prior violations of the policy on minors and the falsification of certain time-clock records (Nicolosi Aff. ¶ 7; Doc. # 34 at Ex. 2), but these facts are not apparent to the Court on the face of the documents, and Nicolosi provides no greater explication of their content. They are, therefore, of little factual value.)

Several days later, on April 25, Nicolosi met with Roosa at the latter's request to discuss her memorandum of April 22. (Nicolosi Aff. ¶ 8.) Roosa was upset and demanded that she state what her intentions were in submitting the memorandum and accompanying information. (Id.) She did not state what she intended to "do" with the information, only that she did not know, and that she also did not know what her intentions were with respect to continuing in the employ of McDonald's. (Id.; Nicolosi Depo. at 88.) (She states in her affidavit that what she intended to indicate

to Roosa was that, if necessary, she was willing to report her findings of apparent violations in the workplace to the "government" (Nicolosi Aff. ¶ 8), but she acknowledged in her deposition that she never told anyone at McDonald's of any intent to contact the Department of Labor or any other governmental agency. (Nicolosi Depo. at 61–62.) Thus, the Court cannot, and does not, make a finding that McDonald's was on notice of this purported intent.) Nicolosi informed Roosa that she had additional information to support her claims, but Roosa never requested that she provide him with copies of such. (Nicolosi Aff. ¶ 9.) He did, however, question her loyalty to McDonald's, and suggested that she might not be happy with the company anymore. (Id.) He also informed her that McDonald's might have to find her a "new home." (Id.)

That evening, Roosa called Nicolosi at home and informed her that she was being transferred back to the Stroop Road restaurant (where his own office happened to be located). (Id. ¶ 10.) Aside from Roosa's comment earlier in the day that McDonald's might have to find her a new home, she had received no prior notice that she would be transferred from the Sugarcreek Plaza location. (Id.) However, according to McDonald's records, Nicolosi's transfer was effective as of April 22. (Aekins–Jackson Aff. (Doc. # 24 at Ex. C) ¶ 3 & attachment.)[3] At the Stroop Road restaurant, she remained a Second Assistant Manager, with the same compensation and benefits. (Nicolosi Depo. at 126, 132–33.) Furthermore, because she had not wanted to transfer from the Stroop Road restaurant to the Sugarcreek Plaza restaurant originally, in August of 2000, she "had

---

**2.** Exhibit 2 of Document No. 34 is comprised of both the memorandum and the attachments thereto.

**3.** Joyce Aekins–Jackson is a Humans Resources Consultant for McDonald's and the custodian of local McDonald's personnel records, including those of Nicolosi. (Aekins–Jackson Aff. ¶ 1.)

no problem working at Stroop," and no complaints upon learning of her transfer back to that location. (*Id.* at 131.)

Despite the fact that she had no complaints with transferring back to Stroop Road, and the fact that she retained her status and benefits as a Second Assistant Manager, Nicolosi's actual duties upon arriving at the Stroop Road restaurant were more akin to those of a crew worker than a manager, and it was five or six weeks before she received the same full managerial access to the Stroop Road restaurant, as she had had at the Sugarcreek Plaza restaurant. (Nicolosi Aff. ¶ 10; Nicolosi Depo. at 17, 126–28.) Even then, other managers ignored her and she stopped receiving word from management as to where she stood with respect to the accelerated management training program. (Nicolosi Aff. ¶ 10; Nicolosi Depo. at 128–30.) She also did not receive any goals or direction from her manager at the Stroop Road restaurant pursuant to the normal performance evaluation process at McDonald's. (Nicolosi Aff. ¶ 10.) On the other hand, despite her claim that other managers ignored her, she acknowledged that she had "a good working relationship" with the principal Stroop Road manager, Jack Duffy, and that she did not perceive that he harbored any malice or ill will toward her. (Nicolosi Depo. at 17, 18.) It also bears noting that the upper level manager who had been advising her with respect to the accelerated management training program was away from work at the time of her transfer, due to back surgery (*id.* at 131), and, what is more, Nicolosi was terminated prior to the start of the normal performance evaluation process in the fall of 2001. (Duffy Aff. (Doc. # 24 at Ex. A) ¶ 3.)

On August 24, 2001, Nicolosi allowed two unauthorized persons into the Stroop Road restaurant after it had already closed. (Nicolosi Aff. ¶ 12.) One of the unauthorized persons was an off-duty employee who was returning some items to the restaurant, and the other was her former boyfriend who needed her to sign some insurance forms. (*Id.*) Nicolosi was aware that both of these separate actions violated company security policies, but also knew that other managers had engaged in similar conduct without ever having received discipline. (*Id.* ¶ 13; Nicolosi Depo. at 232–36.) On August 27, she met with her manager, Jack Duffy, to discuss her violations. (Nicolosi Aff. ¶ 14.) Duffy took her manager's keys from her and informed her she would probably be suspended, but that an investigation had yet to be conducted. (*Id.*) He did not take a written statement from her. (*Id.*; Nicolosi Depo. at 233.) She did not report to work on August 28, under the belief that she was suspended pending the investigation into her conduct. (Nicolosi Aff. ¶ 15.) Duffy, however, called and left her a voice message asking her why she had not reported for the day. (*Id.*) Surprised by his message, because she thought she was suspended, she left a message for the person conducting the investigation into her conduct, Patty Mills, stating that on advice of counsel, she would not be reporting for work. (*Id.*; Mills Aff. (Doc. # 24 at Ex. B) ¶ 3;[4] Nicolosi Depo. at 211.)[5] She did not

---

**4.** Patricia E. Mills was an Operations Consultant for McDonald's during the relevant time period. (Mills Aff. ¶ 1.)

**5.** Nicolosi was confused at her deposition as to whether she or Porter, who was her roommate in addition to having been her manager, left the message for Mills. (Nicolosi Depo. at 210–211.) Regardless, she and Porter were together when the message was left. (*Id.* at 210.) She also does not dispute, though she does not fully recall, that she left another message for Mills on Wednesday, August 29, 2001, stating that she would not talk to Mills or Duffy again without her attorney being present. (Nicolosi Depo. at 220–21.)

ask anyone in her chain of command what she should do; she merely informed them that she would not be reporting for work. (Nicolosi Depo. at 215.)

She was contacted by Patton and Mills on September 5, 2001, and presented with a termination notice. (*Id.* ¶ 16; Nicolosi Depo. at Ex. N–5.) The notice listed her violations of August 24 and the fact that she did not report for work on August 28, or anytime thereafter. (Nicolosi Depo. at Ex. N–5.) It also stated that she refused to cooperate in the investigation of her August 24 conduct by refusing to give a written statement. (*Id.*) It was for all of those reasons that McDonald's stated it was terminating her. (*Id.*) Nicolosi refused to sign the notice because she disagreed with the charge that she refused to cooperate with the investigation by refusing to give a written statement, something Duffy had never asked her to do. (Nicolosi Aff. ¶ 16; Nicolosi Depo. at 233–34.)

Both Porter and Nicolosi were aware of and purported to rely upon certain discipline policies set forth in McDonald's Human Resources Operations and Training Manual ("Management Handbook"). (Doc. # 34 at Ex. 3.) The Management Handbook expressly states, at page 4, that the policies stated therein "do not constitute promises or establish contractual rights between McDonald's and any of its employees." It also makes it clear on the same page that employment at McDonald's is "at will." At page 35, it notes that the termination of employees generally results for one of two reasons: poor performance or policy or rule violations. It states that terminations "should be well documented, based on fact, consistent with previous actions, and fair." At page 36, it counsels managers to "review all the facts before deciding to terminate [an] employee" for

reasons of poor performance, and to treat the employee at issue "consistently with others who have had similar performance issues." Unfair treatment, the Management Handbook goes on, is "contrary to McDonald's policies," and may result in discrimination lawsuits.

In the event of policy violations, the Management Handbook, at page 36, counsels managers to allow for a 24-hour "cooling-off" period before terminating an employee, regardless of the severity of the supposed violation. During this cooling-off period, it directs the manager to "suspend" the employee for a definite period of time to provide opportunity to review the facts. Managers are told to listen to "the employee's side of the story," and, again, to treat the employee in a manner consistent with how others who have engaged in similar conduct have been treated.

Nicolosi bases her FLSA claim (Count Four) on her allegation that her transfer back to the Stroop Road restaurant, where she claims she would be "under the watchful eye" of Roosa, was in retaliation for her having indicated her possible intent to inform "the government" of McDonald's alleged FLSA violations. She also claims that her termination, slightly more than four months later in time, was an additional retaliatory act. Nicolosi's other claim for retaliation (Count Three) is based on her allegations that, in terminating her, McDonald's violated Ohio's public policy against disciplining employees in an unfair and inconsistent manner, and/or its public policy against terminating whistleblowers.[6] The claim for promissory estoppel (Count One), raised by both Plaintiffs, is based on their allegations that they, in their respective jobs, relied upon McDonald's implied promise to treat them fairly and consis-

---

**6.** Oddly, Nicolosi does not invoke Ohio's whistleblower statute, Ohio Rev.Code § 4113.52, to state her claim.

tently relative to its treatment of other employees and managers who had engaged in similar conduct, and that it did not do so when it terminated them in the respective manners that it did. The claim for negligence (Count Two), also raised by both Plaintiffs, merely reconfigures the allegations of the promissory estoppel claim, and alleges that in failing to abide by its implied promise (reconfigured as a "duty") to treat them fairly and consistently in meting out discipline, McDonald's and the individual Defendants acted negligently.

After setting forth the standard for ruling on a motion for summary judgment, the Court will address a jurisdictional shortcoming to this litigation, not addressed by the parties, which requires the remand of the case to the extent it was brought by Porter. Following that discussion, the Court will address the Motion for Summary Judgment stated against Nicolosi.

## II. *Standards Governing Motions for Summary Judgment*

■ Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

■ Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond

the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the factfinder. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ..."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### III. *Analysis with Respect to Porter*

■ Before a federal court can turn its attention to the merits of a cause of action, it must be certain of its subject matter jurisdiction. While neither party herein raises subject matter jurisdiction as an issue, it is axiomatic that the Court must do so on its own where there is reason to think such is lacking. *See In re Millers Cove Energy Co., Inc.*, 128 F.3d 449, 450 (6th Cir.1997). In this case, the Court finds that it has no subject matter jurisdiction over the claims raised by Porter. Thus, insofar as the case at bar is one brought by her, it must be remanded to the Montgomery County Common Pleas Court. *See* 28 U.S.C. § 1447(c).

To understand the Court's conclusion on this matter, attention must be given to the scope of the federal jurisdictional statutes and the overriding constitutional limits to federal district court jurisdiction, as well as to the meaning of the term "cause of action." Section 1 of Article III of the United States Constitution grants Congress the power to ordain federal courts inferior to the Supreme Court. However, section 2 of that Article limits the jurisdiction of the federal courts to certain cases and controversies, including cases arising under the Constitution and the laws and treaties of the United States, and controversies between citizens of different states. Pursuant to the authority vested in it by

the Constitution, Congress has vested in the district courts original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and "all civil actions where the matter in controversy exceeds the sum or value of $75,000 ... and is between ... citizens of different States." *Id.* § 1332. Congress has further provided that where a "civil action" is originally filed in a state court, it may be removed to the geographically appropriate federal district court, provided that said district court would have original jurisdiction over same. *Id.* § 1441(a). In addition:

> Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates.

*Id.* § 1441(c).

In removing the case at bar from the Common Pleas Court to this one, McDonald's invoked § 1441(a) and (c). Its reason for invoking sub-section (a) was the fact that the Court would have original jurisdiction over the FLSA count under § 1331. (There is no argument that the parties are diverse, such that § 1332 might also be applicable to establish the Court's original jurisdiction.) McDonald's invoked sub-section (c) on the ground that the Court has supplemental jurisdiction, or pendent jurisdiction, over the state law claims. (Joint Notice of Removal (Doc. # 1) ¶ 2(b).) However, because the factual predicates for the Plaintiffs' individual claims are distinct, McDonald's invocation

of § 1441(c) was, to an extent, faultily premised.

■ With respect to Nicolosi, there was no need to invoke § 1441(c). All four of the counts she has plead arise out of the same nucleus of operative fact. That is to say, her transfer to the Stroop Road restaurant and her subsequent termination are the acts which give rise to all four of her counts, be they federal or state in nature. This point is important to pin down because it bears on understanding and distinguishing what individual counts come within the scope of a cause of action removed under § 1441(a) and those which come within the scope of § 1441(c). Ostensibly, the term "cause of action" was rendered obsolete in legal parlance with the passage of the Federal Rules of Civil Procedure ("Rules"), which recognizes only one form of action: the "civil action." Fed.R.Civ.P. 1. However, as courts and commentators have noted, the term continued to generate confusion after the passage of the Rules in 1937. *See, e.g., United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 724, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Douglas D. McFarland, *The Unconstitutional Stub of Section 1441(c),* 54 Ohio St. L.J. 1059 (1993). Indeed, Congress added to the confusion, utilizing the term when it enacted § 1441 in 1948. Regardless of the varied historical and existing usages of "cause of action," the Supreme Court has held that when invoking § 1441(c) for purposes of removing a non-federal claim, it is necessary to demonstrate that said claim bears a "complete disassociation" from the "separate and independent [federal] claim or cause of action" over which the district court would have original jurisdiction. *American Fire & Cas. Co. v. Finn,* 341 U.S. 6, 12, 71 S.Ct. 534, 95 L.Ed. 702 (1951).[7] In other words,

---

7. *Finn* was decided at a time when § 1441(c) contemplated removal of a separate state cause of action if it had been plead along with

a cause of action over which a federal court would have subject matter jurisdiction pursuant to either the federal question statute

"where there is a single wrong to plaintiff, for which relief is sought, arising from an interlocked series of transactions, there is no separate and independent claim or cause of action under § 1441(c)," merely because separate state law claims are plead alongside federal claims. *Id.* at 14, 71 S.Ct. 534; *see generally id.* at 9–16, 71 S.Ct. 534; *see also First Nat'l Bank of Pulaski v. Curry,* 301 F.3d 456, 465–67 (6th Cir.2002) (recognizing the *Finn* standard for determining the existence of separate and independent claim or cause of action); *Kabealo v. Davis,* 829 F.Supp. 923, 926 (S.D.Ohio 1993) ("The use of different counts to plead different legal theories or multiple theories of recovery does not automatically make those counts separate and independent."); *Busey v. Board of County Comm'rs of the County of Shawnee,* 163 F.Supp.2d 1291, 1296 (D.Kan. 2001).

■ Applying the holding of *Finn* to the facts of this case, it becomes apparent that Nicolosi has plead but a single cause of action, consisting of four counts, one of which is federal in nature, the other three state law in nature. Because her four counts arise from a single "interlocked series of transactions," *Finn,* 341 U.S. at 14, 71 S.Ct. 534, or, stated another way, from "a common nucleus of operative fact," and because they "are such that [she] would ordinarily be expected to try them all in one judicial proceeding," *Gibbs,* 383 U.S. at 725, 86 S.Ct. 1130, it is proper to recognize that they were all removed to this Court from the Montgomery County Common Pleas Court pursuant to § 1441(a), without the need of § 1441(c). *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 354, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (noting that "pendent claims are not 'separate and

independent' within the meaning of [§ 1441(c)]"). In such fashion, the FLSA count serves as the Court's source of original jurisdiction (§ 1331), while the three state law counts can be heard by the Court pursuant to its authority to take supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *Long v. Bando Mfg. of Am., Inc.,* 201 F.3d 754, 761 (6th Cir.2000); *Broad v. Alsthom Automation, Inc.,* 186 F.Supp.2d 787, 790 (E.D.Mich.2002); *see also* 14C Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3724, at 60 (3d ed.1998); McFarland, *supra,* at 1078.

■ It is another matter, however, with the claims stated by Porter. Although the two state law claims which she joins, for promissory estoppel (Count One) and negligence (Count Two), are identical in nature to those stated by Nicolosi insofar as the underlying legal theory is concerned, in fact they constitute entirely separate claims, and an entirely separate cause of action (i.e., a separate constitutional case). The factual nexus which exists between Porter and McDonald's relevant to Porter's claims is entirely separate and independent from the factual nexus between Nicolosi and McDonald's relevant to Nicolosi's claims. In other words, the underlying facts giving rise to the alleged wrongs allegedly perpetrated on Porter are not the same as those giving rise to the alleged wrongs allegedly perpetrated on Nicolosi. Each Plaintiff has her own, separate grievance with McDonald's. Porter's claims arise out of her own termination, an occur-

(§ 1331) *or* the diversity jurisdiction statute (§ 1332). In 1990, Congress amended § 1441(c), limiting its use in cases where the source of original jurisdiction in the federal

court would be federal question jurisdiction. Nevertheless, the amendment did not alter the effect of the *Finn* holding.

rence which is factually distinct from Nicolosi's transfer and subsequent termination.[8] While there is nothing illogical about the two of them bringing their actions in a single civil action, it cannot be said that one would "expect" them to do so, given that their distinct grievances do not arise from a common nucleus of operative fact or the same series of transactions or occurrences. Put simply, Porter's rights and interests do not have a "factual and logical dependence" upon the outcome of Nicolosi's cause of action, *see Peacock v. Thomas*, 516 U.S. 349, 355, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996), and their separate grievances are not so closely related such that it can be said they form a single constitutional case.[9] *See Gibbs*, 383 U.S. at 725, 86 S.Ct. 1130.

What this means is that insofar as Counts One and Two are brought by Port-

er, they constitute a separate cause of action, and are not supplemental to Nicolosi's FLSA claim. Viewed in a different way, because Porter's claims are not supplemental to Nicolosi's FLSA claim, had Nicolosi originally filed her cause of action in this Court, Porter would not have been entitled to join the action under § 1367(a), because her own claim claims are not pendent to Nicolosi's cause of. action. The analysis is no different in the context of removal. Because Porter's state law claims do not arise out of the same nucleus of operative facts underlying Nicolosi's FLSA claim, removal.jurisdiction does not exist for them under § 1441(a).

On the face of things, the fact that Porter's claims are not supplemental to Nicolosi's cause of action would not appear to present a problem, given that § 1441(c) expressly states that where a "separate

8. Porter's termination obviously motivated Nicolosi to take some actions that, as she alleges, ultimately bore on her own termination, but the nexus between the two is extremely attenuated. Whatever actionable injury befell Porter, it was complete no later than the date of her termination, April 20, 2001. Nicolosi did not experience an alleged actionable injury until April 25, 2001, when she was informed of her transfer back to the Stroop Road restaurant, and no actions which Nicolosi took in the interim which might possibly have contributed to the decision to transfer her were caused by any action McDonald's had taken with regard to her. Thus, even if their respective claims are meritorious, they are wholly separate and distinct.

9. By "constitutional case," the Court means all claims joined in a civil action which arise out of a common nucleus of operative fact, or the same transaction or series of transactions, exclusive of any claims joined in that same civil action which do not arise out of a common nucleus of operative fact, or the same transaction or series of transactions. That many of the facts which might help Porter make out her promissory estoppel and negligence claims against McDonald's would also likely be relevant to Nicolosi's claims does not render their joint claims a single constitutional case. Their claims in this context are no

more related than would be claims brought by multiple tenants against a common landlord for breach of separate lease agreements. Even if judicial economy might favor litigating their claims in a single proceeding, such as is the case with class actions, concerns about judicial economy cannot overcome the absence of subject matter jurisdiction. *See Finley v. United States*, 490 U.S. 545, 552, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). The standard is whether the underlying facts giving rise to their respective claims are common to both. Because they are not, it cannot be said that their claims form a single "constitutional" case. Indeed, the Court can scarcely state this proposition better than McDonald's has done itself:

> There are two plaintiffs in this case, Linda Porter and Lisa Nicolosi, and they each allege similar claims regarding the termination of their employment as managers at McDonald's. However, the two plaintiffs were discharged at different times and for completely different reasons. This case therefore presents the equivalent of two separate lawsuits, each determined by the facts and circumstances particular to each respective plaintiff.

(Doc. #25 at 1.) The Court is in complete agreement with this statement.

and independent" federal claim or cause of action has been joined in state court with "one or more otherwise non-removable claims, the *entire* case may be removed" (emphasis added). McDonald's removal of Porter's claims pursuant to sub-section (c) would thus seem to conform with what the Supreme Court had in mind in *Finn.* In fact it does, but the problem in this case is not one of statutory permissibility, but of constitutional limitation, an issue not presented to the Court in *Finn.* In *Gibbs,* the Supreme Court stated that "there is *power* in federal courts to hear the whole [of a case]" where the state and federal claims "derive from a common nucleus of operative fact," such that one would typically expect them to be tried in one judicial proceeding. 383 U.S. at 725, 86 S.Ct. 1130 (emphasis in original). Moreover, the Supreme Court stated in *Owen Equip. & Erection v. Kroger,* 437 U.S. 365, 371, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978), that the *Gibbs* standard "delineated the constitutional limits of federal judicial power."

▬▬ In light of *Gibbs* and *Kroger,* it is difficult, if not impossible, to find § 1441(c), in its present form, constitutionally sound.[10] As stated in the Commentary to 28 U.S.C.A. § 1441 (West 1994):

> But if subdivision (c) doesn't apply to the "pendent" claim, then what does it apply to? Restricted now to federal question cases but not needed for the most obvious federal question adjunct— the state claim that finds pendent juris-

diction in the federal claim—where can it operate? If it tries to operate on a state claim joined in the state action but wholly unrelated to the federal claim, it will have no basis at all for claiming federal jurisdiction and an attempt at removal under subdivision (c) would once again pose a constitutional issue.[11]

Indeed, other courts and legal scholars have declared this provision to be unconstitutional, in that it attempts to give to the federal district courts subject matter jurisdiction which the Constitution forbids. *See Fullin v. Martin,* 34 F.Supp.2d 726, 735 (E.D.Wis.1999); *Salei ·v. Boardwalk Regency Corp.,* 913 F.Supp. 993, 1010 (E.D.Mich.1996); *see also Thomas v. Shelton,* 740 F.2d 478, 482–84 (1984) (Posner, J.) (questioning at some length, albeit in dicta, whether § 1441(c) could ever be applied in a constitutional manner); *Cedillo v. Valcar Enter. & Darling Delaware Co., Inc.,* 773 F.Supp. 932, 935 n. 3 (N.D.Tex. 1991) (same, citing *Thomas, supra* ); 14C Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *supra,* § 3724, at 63– 65; McFarland, *supra,* at 1080–85.

The point made by all of the authorities cited in the preceding paragraph is that because supplemental state law claims arising out of the same nucleus of operative facts, such that they form part of the same constitutional case, are already removable under § 1441(a), pursuant to the district court's supplemental jurisdiction (§ 1367(a)),[12] § 1441(c) serves no other

---

**10.** As noted in *Finn,* the predecessor to the current version of § 1441(c) provided for removal *in cases where there was diversity of citizenship,* and provided that any one or more defendants could remove the action. 341 U.S. at 9, 71 S.Ct. 534. Such claims against individuals were said to be "separable" from the claims as to any other of the defendants, but not "separate." *Id.* at 10, 71 S.Ct. 534. In amending § 1441(c) to provide for removal thereunder only where the federal and state claims or causes of action were "separate and independent," Congress in-

tended to make it more difficult for separate defendants to remove actions without the consent of other defendants. *Id.* at 10–11, 71 S.Ct. 534.

**11.** The Commentary was authored by Professor David D. Siegel.

**12.** Prior to the enactment of § 1367 in 1990, and the adoption of the term "supplemental jurisdiction," courts referred to "pendent claims" or "pendent parties." In any event, "pendent" jurisdiction was a part of the com-

purpose than to allow the removal of wholly separate and distinct state law claims, which but for the pleading of the "separate and independent" federal claim would not be ones over which a federal district court could assume subject matter jurisdiction. Concluding that such a procedure would run afoul of the *Gibbs* standard of what constitutes a "case" for purposes of Article III, § 2, of the Constitution, these authorities have concluded (or strongly suggested) that the provision is unconstitutional.

Opposing arguments have been raised, the most noteworthy of which being that of Professors James W. Moore and William VanDercreek, who argued over 40 years ago, prior to the Supreme Court's decision in *Gibbs*, that § 1441(c) merely indicates that a district court's removal jurisdiction is broader than its original federal question jurisdiction, in that it allows the court to entertain state claims presented via the removal process that it would not be able to entertain had they been brought as part and parcel to a wholly separate and independent federal cause of action originally filed in the federal court. *See* James W. Moore and William VanDercreek, *Multi–Party, Multi–Claim Removal Problems: The Separate and Independent Claim Under 1441(c)*, 46 Iowa L.Rev. 486, 489 (1961) (as cited in McFarland, *supra*, at 1082 & n. 99). This argument reflected the comments Professor Moore had made over a decade earlier in his capacity as a member of the revision committee which drafted the statute. *See* Moore's Commentary on the United States Judicial Code 253 (1949) (reprinted in 16 James M. Moore, et al., Moore's Federal Practice § 107 App. 106[3], at 107App.–111–117 (Matthew Bender 3d ed.1997)).

The shortcoming to this argument is that, however much it may honor the language of the statute, it ignores, intentionally or not, the obvious constitutional defect, which is the fact that the Supreme Court has never interpreted Article III, § 2, as allowing a federal court to assume jurisdiction of certain subject matter in a removal action which it could not in an original action. In other words, whether subject matter is presented to a district court pursuant to a removal action or an original action, it seems plain that *Gibbs* delineates the limit of its jurisdiction. *See Fullin*, 34 F.Supp.2d at 734; *Salei*, 913 F.Supp. at 1006–10. Professor Moore's argument also seems to be premised on a faulty thesis, to wit: that Congress intended to expand federal court jurisdiction when it amended § 1441(c) in 1948 to include the language relevant to the herein discussion, when in fact, Congress' intent was to constrict removal jurisdiction. *See supra* note 10; *Curry*, 301 F.3d at 464–65 (holding that the removal statutes, including § 1441(c), must be construed narrowly).

Having considered the matter, the Court agrees with the conclusion reached in *Fullin* and *Salei*, which is in accord with the view colorfully highlighted by the Seventh Circuit in *Thomas*, and vociferously endorsed by Professor McFarland and others. Until the Supreme Court, or the Sixth Circuit, articulates the manner by which § 1441(c) can be invoked that is neither duplicative of what is already available under § 1441(a) and § 1367(a), nor violative of *Gibbs*, or at the very least announces in concrete terms that *Gibbs* does not represent the "constitutional limits of federal power," *Kroger*, 437 U.S. at 371, 98 S.Ct. 2396, this Court finds no

mon law that had developed surrounding cases that included both claims within the original jurisdiction of a federal court (by either diversity of federal question) and

claims arising under state laws. *See Gibbs, supra.* The point is that the concept of supplemental jurisdiction predated the enactment of § 1367.

constitutional use for § 1441(c). Ergo, it was impermissible for McDonald's to invoke same in this case for purposes of removing the promissory estoppel and negligence claims of Porter.

For the foregoing reasons, the Court finds that it lacks subject matter jurisdiction over Counts One and Two, to the extent such have been brought by Porter. Accordingly, they will be remanded to the Common Pleas Court of Montgomery County, see § 1447(c), and the Defendants' Motion for Summary Judgment against Porter (Doc. # 25) is OVERRULED, without prejudice to their renewing same in the Common Pleas Court.

## IV. *Analysis with Respect to Nicolosi*

With respect to Nicolosi, the Court will first consider the Defendants' Motion for Summary Judgment against her as it relates to her FLSA claim, stated as Count Four in the Amended Complaint. It will then consider the Defendants' Motion as it relates to her three supplemental state law claims.

### A. *FLSA (Count Four)*

The FLSA was originally enacted by Congress in 1938 to address "labor conditions detrimental to the maintenance of the minimum standard of living necessary for [the] health, efficiency, and general well-being of workers." 29 U.S.C. § 202. It was Congress' finding that such conditions had a deleterious effect not only on the affected workers, but on interstate commerce itself. *See id.* One such "unfair" labor condition which Congress sought to outlaw was "oppressive child labor." *See id.* § 212.[13] Another such condition was the absence of a guaranteed minimum wage, which it rectified by creating one. *See id.* § 206. Further, Congress gave teeth to the law by prohibiting employers from discharging or otherwise discriminating against "any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." *Id.* § 215(a)(3).

Nicolosi bases her FLSA claim on the fact that she was, *first,* transferred from one McDonald's restaurant to another, and, *second,* eventually discharged altogether, following her submission of her memorandum to her supervisors (submitted on April 22, 2001, prior to her transfer), in which she expressed her belief that McDonald's regularly violated the FLSA. (Amend. Compl. ¶¶ 29–31; Doc. # 34 at unnumbered pp. 11–12 & Ex. 2.)[14] She argues in her Memorandum in Opposition (Doc. # 34),[15] that this memorandum,

---

13. "Oppressive child labor" is defined at 29 U.S.C. § 203(*l*). The complete definition is irrelevant for present purposes, but, generally, the phrase refers to the employment of children under the age of sixteen years in most circumstances, and the employment of children between the ages of sixteen and eighteen in hazardous working environments, as defined by the Secretary of Labor.

14. Nicolosi argues that McDonald's "retaliatory" actions also constitute violations of its own internal policies. Whatever the truth of such allegations, it is irrelevant to an FLSA claim. Congress, not individual employers, creates federal rights, and Nicolosi cannot base any aspect of her FLSA claim on rights allegedly created by McDonald's alone.

15. For official court purposes, Document No. 34 in the docket file of this case is entitled "Plaintiff's Summary of Arguments Raised and Primary Authorities." Nicolosi's Memorandum in Opposition is attached thereto. The parties should be aware that the Court's references to "Doc. # 34" in the text of this Decision and Entry are to the attached Memorandum in Opposition, and that unnumbered page 1 of said Motion should be understood as the Court's beginning point of reference with respect to its references to particular unnumbered pages.

along with discussions she had with Roosa several days later, sent "an obvious message to McDonald's that she was reserving the right to take her complaints to the government" (i.e., the Department of Labor).

In the absence of direct evidence that McDonald's retaliated against her, which she has not adduced, the appropriate framework for analyzing Nicolosi's claim of unlawful retaliation under the FLSA is the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394 (10th Cir.1997); *Cononie v. Allegheny General Hosp.*, 29 Fed.Appx. 94, 94–95 (3rd Cir.2002). Under that framework, Nicolosi must first make a prima facie showing of retaliation. If she can do this, she "in effect creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citation omitted). A prima facie claim of retaliation requires Nicolosi to show the existence of a genuine issue as to whether: 1) she engaged in an activity protected by the FLSA; 2) her exercise of this right was known by McDonald's; 3) thereafter, McDonald's took an employment action adverse to her; and 4) there was a causal connection between the protected activity and the adverse employment action. *See Williams v. General Motors Corp.*, 187 F.3d 553, 568 (6th Cir.1999).

Nicolosi's FLSA claim is defective with respect to each element of her prima facie case. In this case, the first two elements go hand in hand. It is not even argued that at the time of her transfer or discharge she had "filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA], or [had] testified or [was] about to testify in any such proceeding, or [had] served or [was] about to serve on an industry committee," such that McDonald's could have retaliated against her for participating in an activity expressly protected by § 215(a)(3). Moreover, even if the expression of one's intent to contact the Department of Labor should be recognized as a protected activity, pursuant to a liberal reading of the FLSA, Nicolosi stated in her deposition that she never expressed such an intent to Roosa or anyone else at McDonald's. (Nicolosi Depo. at 61–62.) As noted above in the Factual Background portion of this Decision and Entry, all she stated in her memorandum was that McDonald's had "officially been 'made aware of the situation'" and that she had a "decision to make" about how to "handle it," the "situation" apparently being her discovery of one alleged prior act of paying an employee less than minimum wage and one other manager's use of "foul" language. Furthermore, all she conveyed to Roosa at their meeting on April 25, 2001, was that she was not sure what her intent was with regard to the information she had gathered as part of her "investigation" and that she was not sure what her future plans were with respect to working at McDonald's.

For the reasons stated in the above paragraph, Nicolosi cannot show that she ever engaged in a protected activity or that, even if she had, McDonald's was aware of that fact. As to the latter element, Nicolosi points out that Roosa stated in his deposition that "at some point," it crossed his mind that Nicolosi might make complaints to the government. (Doc. # 34 at 12; Roosa Depo. at 60.) When Roosa's comment is read in its proper context, it is apparent that it is immaterial. At one point during his deposition, the following exchange took place (with reference to Nicolosi's April 22, 2001, memorandum, and his meeting with her on April 25):

Q: Did you read that letter as containing an assertion that she might take her information to the Department of Labor?

A: An assertion of that? That's not how I recall taking this letter. This letter was again targeted at many things, at many levels, as it even says there. But the wage and hour people were out in our industry through the course of, I think the fourth quarter 2000 through third quarter 2001 minimally—I don't know, heck, Joyce can tell you more—but they are in the industry and newspaper once a week minimum, they are not on the news. So Lisa's tone there had nothing to do with any, I guess, liability or anything like that. That is not what crossed my mind.

(Roosa Depo. at 59.) Several questions later, the following exchange took place:

Q: Okay. When you read the phrase, "because I have a decision to make about how I will handle it as well," what was your reaction?

A: I didn't have a reaction to any one line in here. There was reaction from the tone in the whole letter.

Q: Did it ever cross your mind that she was in essence saying if the situation is not rectified, that she was going to take her protest to the government or somewhere else?

A: Did it ever cross my mind? At some point, sure, but it never was part of why I wanted to meet with her on the 25th or chose to, you know, anything like that. It was part of this stuff in front of me.

(*Id.* at 60.)

Nicolosi's reliance on this last answer is not justified. *First*, because the question being answered was a compound one, it is impossible to know whether the thought that crossed Roosa's mind was that Nicolosi might take "her protest" to "the government" or to "somewhere else," presumably an entity other than the government. *Second*, when read in conjunction with the preceding questions and answers, it is apparent that whenever it occurred to Roosa that Nicolosi might "take her protest to the government or somewhere else," it was well after she was transferred. *Third*, and finally, this Court believes that even if the FLSA is to be read broadly as a remedial statute so as to protect certain activities that are within "its spirit" if not exactly its express language, at the very least the protected activity being asserted must be identified with some certainty and precision. In this case, it has not been. Not only did Nicolosi not actually mention an intent to notify the Department of Labor (or anyone else) of purported FLSA violations at McDonald's, but she has not so much as demonstrated that she definitely possessed such intent. She stated in her deposition that she told Roosa she "had not decided what course of action to take" with respect to the subject matter of her letter. (Nicolosi Depo. at 84; *see also* Nicolosi Aff. ¶ 8.) In sum, it is unreasonable for Nicolosi to contend that Roosa walked away from their meeting on April 25, 2001, with a definite appreciation for the fact that she intended to notify the Department of Labor of certain FLSA violations she had supposedly unearthed if McDonald's did not rectify them, given that she did not even know herself what she intended to do.

■ With respect to the third element of a prima facie claim of retaliation, the Court also agrees with McDonald's that Nicolosi has not shown she suffered an adverse employment action. Her transfer back to the Stroop Road restaurant does not approach, even remotely, being an adverse employment action. As the facts recounted above demonstrate, she admitted that she was not bothered by the transfer, that she had not wanted to be

transferred to the Sugarcreek Plaza restaurant in the first place, and that she had no complaints with being transferred back. Moreover, she retained her same title, pay and all benefits, and had complete managerial access to her restaurant within five or six weeks of being transferred back.

Indeed, it is not so much her transfer that bothers her, but what she perceived to be the diminution of her authority once she arrived. The Sixth Circuit has addressed this issue. In *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876 (6th Cir. 1996), a registered nurse brought suit under the Americans with Disabilities Act ("ADA"),[16] alleging, as one theory of recovery, that her rotation from the position of "nursing supervisor" to that of "unit nurse" constituted a demotion, i.e., an adverse employment action. 97 F.3d at 880. Quoting an earlier decision out of the Eastern District of Kentucky which it had affirmed, the Court stated that " 'barring unusual circumstances, a transfer at no loss of title, pay, or benefits does not amount to an adverse employment action.' " *Id.* at 886 (quoting *Darnell v. Campbell County Fiscal Court*, 731 F.Supp. 1309, 1313 (E.D.Ky.1990), *aff'd*, 924 F.2d 1057, 1991 WL 11255 (6th Cir.1991))(alterations omitted). The court then went on to hold that because the plaintiff therein had not demonstrated that she had suffered a loss of pay or benefits, a diminution in prestige of position, or a material change in her work duties, she was unable to demonstrate that her employer had taken an adverse employment action against her. *Id.* at 886–87. The bottom line, the Sixth Court stated, is that a plaintiff must be able to show that he or she has suffered a "materially adverse" action. *Id.* at 887.

More recently, in *White v. Burlington N. & Santa Fe Ry. Co.*, 310 F.3d 443 (6th Cir.2002), the Sixth Circuit emphasized that when citing a change in work duties as one's adverse employment action, the plaintiff must demonstrate that she experienced "significantly diminished material responsibilities," and that the alleged "change in employment conditions 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.' " 310 F.3d at 450 (quoting *Kocsis*, 97 F.3d at 886 (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.1993))). The plaintiff in *White* was a railroad worker who had been reassigned from her forklift operator's position to the more physically demanding job of track laborer, the position into which she had originally been hired. *Id.* at 447. She claimed her transfer was retaliatory. Importantly, she suffered no diminution in title, pay or benefits. *Id.* at 451. The Sixth Circuit, reversing a jury verdict in favor of the plaintiff, held that a job reassignment resulting in different duties, but duties which nonetheless came within the broad range of duties for which she had been hired to perform, did not constitute a materially adverse employment action. *Id.*

Nicolosi does not contend that she suffered a diminution in personal prestige, and even remarks that the crew employees were friendly to her. (Nicolosi Aff. ¶ 10.) Furthermore, her allegations that she was "ignored" by her fellow managers and prevented from re-assuming the full duties of a Second Assistant Manager for about five or six weeks simply do not amount, as a matter of law, to a "materially adverse" action, be it characterized as a diminution in authority or a material change to her work duties. She does not explain in her Memorandum in Opposition how she was ignored by other managers, and by itself,

---

**16.** Claims brought pursuant to the ADA, 42 U.S.C. § 12112, are analyzed under the same burden shifting framework as the FLSA. *See Kocsis*, 97 F.3d at 882.

the assertion means nothing. Indeed, as noted, she acknowledged that she had a good working relationship with Duffy, the principal restaurant manager. With respect to her job duties, it is clear, given that her pay, benefits, and title remained the same, and that she did not, in fact, suffer a diminution in prestige of position. As highlighted by the Sixth Circuit's holdings in *Kocsis* and *White*, these facts, along with the five to six week gap between her transfer to the Stroop Road restaurant and her obtaining full managerial access to same, did not constitute a material change in her work duties, as a matter of law.

■ The Court finds support for this conclusion in *White*. In addition to her allegation that her employer retaliated against her by transferring her to a different position, the plaintiff in *White* alleged that it also retaliated against her by suspending her for five weeks for a purported act of insubordination. 310 F.3d at 445. Though suspended without pay, she was reinstated, with full back pay and benefits, after her employer's investigation revealed that her supervisor had overreacted in accusing her of insubordination. *Id.* at 448. Again, reversing the jury verdict in the plaintiff's favor, the Sixth Circuit held that where an employee is ultimately made whole, an employer's intermediate decision to suspend that employee does not amount to an adverse employment action. *Id.* at 451–55. Though a comparison to the facts of *White* must be made by analogy only, it is readily done. Certainly, if a five-week suspension without pay does not constitute an adverse employment action, a five or six-week period of diminished responsibilities alone cannot. As the *White* court noted, "an adverse employment action must be based on an 'ultimate employment decision' by an employer." *Id.* at 453. Thus, while it would be a different matter had Nicolosi been demoted to a crew worker's position on a permanent basis, nothing

of the like occurred in this case. At most, without any loss of title, pay or benefits, she was given fewer responsibilities for the first five or six weeks of her employment following her transfer to the Stroop Road restaurant. That is not materially adverse.

As a final point on the issue of her transfer and surrounding circumstances, nothing can be made of her allegations that McDonald's ceased guiding her as part of the accelerated management training program, or that she did not receive managerial guidance pursuant to a performance review. As to the latter issue, it is uncontroverted that she was terminated before the review process began for the year 2001. (Duffy Aff. ¶ 3.) As to the former, Nicolosi acknowledged that the person with whom she had been working had been away on account of back surgery (Nicolosi Depo. at 131), and the most the Court can glean from its own search of the facts is that prior to her transfer, she was "occasionally updated" on her accelerated development. (*Id.* at 129.) The last "update" she received was in March, 2001. (*Id.* at 130; Nicolosi Aff. ¶ 10.) Given that Nicolosi was terminated only five months later, prior to her yearly performance review, the Court does not find it a reasonable inference, based on the facts she has adduced, that her "occasional updates" had ceased.

■ Because she cannot show that she engaged in a protected activity, that McDonald's was aware that she was thus engaged, or that her transfer was an adverse employment action, the Court does not even reach the "causal connection" element of the prima facie case, insofar as her FLSA claim arises from her transfer. Her termination, on the other hand, presents a different matter. Clearly, one's involuntary termination is generally considered materially adverse. Nevertheless,

Nicolosi was not terminated for over four months after she submitted her memorandum to McDonald's, and it is here that the causal connection element of her prima facie case would be dispositive even if factors (1) and (2) were not. This temporal lag is so great that Nicolosi only refers to her termination once, and then only in passing, in the portion of her Memorandum in Opposition devoted to her FLSA claim. (*See* Doc. # 34 at unnumbered pp. 11.) In the absence of other probative facts, a temporal lag of over four months between the doing of the so-called protected activity and the so-called adverse employment action cannot give rise to an inference of retaliation. *See, e.g., Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363–64 (6th Cir.2001); *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir.1986).

 Even if Nicolosi could make out her prima facie case of retaliation, the facts adduced by McDonald's demonstrate that it had a legitimate basis for terminating her. (The Court need not consider McDonald's proffered legitimate reasons for transferring her in April of 2001 because it is patently clear that Nicolosi did not consider that to be an adverse employment action at the time it occurred, and that it was not.) Where a plaintiff makes out a prima facie case of retaliation, the burden of production passes to the defendant to adduce facts demonstrating it had a legitimate basis for doing the allegedly retaliatory act, and if it can do so, the burden shifts back to the plaintiff to rebut the defendant's facts. *See Hicks*, 509 U.S. at 506, 113 S.Ct. 2742; *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994).

Herein, the evidence, in particular the copy of Nicolosi's termination notice, demonstrates that McDonald's purported to terminate her because of her security vio-

lations on the night of August 24, 2001, her failure to cooperate in the investigation of that conduct, her failure to appear for work on August 28, 2001, and her failure to appear for work subsequent to August 28. (Doc. # 34 at Ex. 5.) The only charge in her termination notice that she disputes is that stating she did not cooperate with the investigation. (Nicolosi Depo. at 232–36.) The Court agrees with her on this point insofar as McDonald's based this charge on her failure to submit a written statement, given the evidence that she was not provided any such opportunity. (Nicolosi Aff. ¶ 14; Nicolosi Depo. at 208 & 233.) Nevertheless, her admitted security violations and her subsequent refusal to report to work, as scheduled, provide more than ample grounds for her termination.

Nicolosi's basis for not reporting to work on August 28 and beyond, aside from any advice she received from anyone else, was her belief that she had been suspended, given the fact that Roosa had taken her keys, and that had she reported to work, she would have gotten into trouble for interfering with the investigation into her conduct. (Nicolosi Aff. ¶ 15; Nicolosi Depo. at 205.) The problem with this contention is that she was never told that she was suspended or should not report to work (Nicolosi Depo. at 208 & 216–17), and she does not direct the Court's attention to any place in the Management Handbook indicating that such a suspension is automatic. The only provision she cites for support is the "cooling-off" provision, at page 36 of the Management Handbook (Doc. # 34 at Ex. 3), which states that a manager should suspend an employee pending the outcome of an investigation. It is plain common sense, though, that until one is informed that she has been suspended or that the terms of her employment have otherwise changed, business should continue as normal. This would be especially true after one's man-

ager leaves a message expressly asking why the employee is not at work. Nicolosi acknowledged that she acted not at the direction of anyone in her chain of command, but on her own assumption of how things worked at McDonald's, and she continued to so act on her assumption that she was suspended even after Roosa asked her why she was not reporting for work. (Nicolosi Depo. at 216–18.) This excuse, which approximates an "ignorance is bliss" philosophy, is grossly inadequate to rebut McDonald's argument that it terminated Nicolosi, in part, because of her failure to report to work on and after August 28, 2001.

Nicolosi's only argument on the issue of her security violations is that she had never known anyone in the past who had been terminated for similar violations. This argument is also insufficient. *First,* and foremost, she does not provide examples of other managers who acted as she did but did not get fired. It is well established that when basing a retaliation or discrimination claim on disparate treatment, the plaintiff must be able to show that she was treated differently than "similarly situated" employees, *Manzer,* 29 F.3d at 1084, and that this means showing that the comparables are similarly situated in all respects. *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992). Without any basis for comparison, Nicolosi's argument lacks merit. *Second,* McDonald's adduced evidence that a manager at a Miamisburg restaurant, who had committed a similar, after-hours security violation in July of 2000, quit while her superior was in the process of informing her of the investigation and suspension process. (Roosa Depo. at 42–43; Reese Aff. (Doc. 36 at Ex. A) ¶¶ 2 & 3 & attachment.) Although this is not evidence of an exact precedent, it does demonstrate that McDonald's did not invent the investigation and discipline process for purposes of dealing with Nicolosi.

For all of the reasons stated above, the Court finds that with respect to Nicolosi's FLSA claim (Count Four), there are no genuine issues of material fact, and McDonald's Motion for Summary Judgment (Doc. # 24) must be SUSTAINED.

### B. *Supplemental Claims Arising Under State Law* [17]

With respect to Nicolosi's three supplemental claims, the Court will first turn to Nicolosi's claim for retaliation in violation of Ohio's public policy (Count Three). As stated in her Amended Complaint, this claim is premised on her allegations that she was terminated for notifying her managers at McDonald's that they were applying discipline in an unfair and inconsistent manner, contrary to the dictates of the Management Handbook. (Amend. Compl. ¶ 27.) In her Memorandum in Opposition, she completely re-characterizes her claim, and alleges that McDonald's violated Ohio's public policy against terminating whistleblowers when it terminated her in response to her having brought certain FLSA violations to its attention in her memorandum of April 22, 2001 (though she does not state a claim under the whistleblower statute itself, Ohio Rev.Code

---

**17.** Having taken jurisdiction over Nicolosi's cause of action on account of it having original jurisdiction over her FLSA claim, the Court also has the authority to decide the merits of her supplemental state law claims. *See* 28 U.S.C. § 1367(a); *Long,* 201 F.3d at 761. Because the Court has already reviewed all of the facts relevant to Nicolosi's claim for retaliation in violation of Ohio's public policy (Count Three), it will decide the merits of that claim herein in lieu of remanding it to the Common Pleas Court. The Court will also decide her claims for promissory estoppel and negligence, in lieu of remanding them, given that the law in Ohio is fairly clear in these areas, and the Court is fully competent to decide them.

4113.52). Whatever her theory, it lacks merit.

■ In Ohio, a cause of action alleging a violation of public policy is recognized where (1) a clear public policy exists and is manifested in a state or federal constitution, statute or administrative regulation, or in the common law; (2) dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy; (3) the plaintiff's dismissal was motivated by conduct related to the public policy; and (4) the employer lacked overriding legitimate business justification for the dismissal. *See Kulch v. Structural Fibers, Inc.,* 78 Ohio St.3d 134, 677 N.E.2d 308, 321 (1997). Indeed, in *Kulch,* the Ohio Supreme Court recognized that a tort cause of action existed against an employer who retaliated against a whistleblower, even though a whistleblower statute already exists in the Ohio Revised Code (§ 4113.52), and even though the plaintiff neither followed the dictates of the statute nor sought relief within the parameters set by the statute.

■ Nicolosi's reliance on *Kulch* is misplaced in this case. To the extent she relies on a policy against retaliating against whistleblowers, her argument fails for the reason already noted with regard to her FLSA claim: she has not shown that she blew any whistle, that McDonald's was aware she blew any whistle, or that she suffered an adverse employment action as a result. Summary judgment is also warranted because, as already stated, McDonald's has demonstrated it had a legitimate basis for terminating her, a factual showing which she is unable to rebut. To the extent the public policy she would have this Court recognize is one where employers would be obligated to apply their internal employee policies in a fair and consistent manner, her claim is equally unpersuasive. To say nothing of the fact that she has not shown that Mc-

Donald's did not apply its policies in a fair and consistent manner, the courts of Ohio have not recognized that such a policy exists. She has not pointed to, and the Court cannot find, a provision in the State or Federal Constitution, any state or federal statute or administrative regulation, or the common law, manifesting a public policy that employers must apply their internal, personnel policies in a fair and consistent manner. Such a policy would present an impossible burden. If this were a recognized tort, no doubt every employee terminated against his or her will would be rushing to the courthouse to file such a claim.

As to this claim (Count Three), the Defendants' Motion for Summary Judgment is SUSTAINED.

Regarding the promissory estoppel claim (Count One), Nicolosi claims that she relied upon the Management Handbook policies to her detriment, particularly the policy that all employees would be treated fairly and consistently. (Amend. Compl.¶ 19.)

■ In Ohio, the elements of a promissory estoppel claim are: (1) a promise, clear and unambiguous in its terms; (2) reasonable and foreseeable reliance; and (3) injury resulting from the reliance. *See Cohen & Co. v. Messina,* 24 Ohio App.3d 22, 492 N.E.2d 867, 872 (1985). The first defect with Nicolosi's claim is that McDonald's did not make a promise, clear and unambiguous in its terms, to apply its policies fairly and consistently. The Management Handbook expressly states, at page 4, that the policies stated therein "do not constitute promises or establish contractual rights between McDonald's and any of its employees." It is specious to argue that McDonald's made a promise that it expressly did not make. By the same token, it would be unreasonable to rely upon any policy, *as if it were a*

*promise,* given the express reservation of a promise.

Furthermore, Nicolosi has not demonstrated how she relied upon the Management Handbook. "Reliance" means more than merely expecting a certain result. Had Nicolosi called someone in her chain of command on the night of August 24, 2001, for approval to let an unauthorized person into the closed restaurant, perhaps for purposes of dealing with an urgent and important personal matter, and had she received a promise or commitment from her superior that she could do so and expect not to be disciplined for her action, then any subsequent act in conformity with her supervisor's permission could be deemed a reliant act. *Under that type of circumstance,* she would have a viable cause of action for promissory estoppel if McDonald's later turned around and disciplined her for violating its after-hours security policy. That is not what occurred in this case. Nicolosi was not actively "relying" on the Management Handbook policy of fair and consistent treatment *at the time she let the unauthorized individuals into the Stroop Road restaurant.* She merely "expected," in hindsight, once her violation was exposed, that she would not be disciplined (at least not terminated), because that was her impression of how McDonald's had treated other managers in the past in similar circumstances. There is a significant difference between active reliance in the first instance, and an ex post facto expectation, and this difference is what demarcates a viable claim for promissory estoppel from one that is not viable.[18]

*Biskupich v. Westbay Manor Nursing Home,* 33 Ohio App.3d 220, 515 N.E.2d 632

(1986), cited by Nicolosi, is not contrary to this holding. In *Biskupich,* the plaintiff, who had been involuntarily terminated, pointed to an employee manual for purposes of demonstrating that her employer had altered their employment-at-will relationship by giving her certain contractual assurances of continued employment unless it could show just cause. The Eighth District Court of Appeals reversed the trial court's grant of summary judgment, finding that genuine issues existed on the question of whether an *employment contract* existed on account of the assurances given in the employee manual, and whether that contract had been breached. 515 N.E.2d at 634. It therefore remanded the case. It is true that the court noted that a promissory estoppel theory of recovery might exist in the alternative, but that portion of its holding was dictum, and was not the focus of the court's analysis. The majority of the other Ohio cases cited by Nicolosi also deal with the question of employment contracts created by virtue of issuing employee handbooks and the like. Such a claim was not raised by Nicolosi, and would fail in any event given McDonald's express notice that its Management Handbook did not constitute an offer of term employment.

The one exception cited is *Jones v. East Ctr. for Cmty. Mental Health, Inc.,* 19 Ohio App.3d 19, 482 N.E.2d 969 (1984), wherein the Sixth District Court of Appeals held that even in the absence of an employment contract, policies set forth in an employee handbook may constitute "promises" sufficient to support a claim for promissory estoppel. With due respect to that court, *Jones* was wrongly decided. In that case, the state appellate court recog-

---

**18.** For Nicolosi to demonstrate reliance given the facts of this case, she would have to show that she let in the unauthorized individuals *because of* the "promise" made by McDonald's to treat its employees fairly and con-

sistently (i.e., that she intentionally violated the security policy because she had been promised that she would be treated fairly and consistently if she did so). For obvious reasons, this is not the mainstay of her argument.

nized the application of promissory estoppel even after it expressly rejected the argument that the employer *had not* induced the employee to rely upon any alleged promise. Initially, under a contract analysis, the court recognized exactly what this Court recognized *supra:* that the employee was not induced to act (i.e., rely) by any promise made by the employer:

> The record *sub judice* indicates that appellant did not suffer a legal detriment, in that the promises made by East Center were not made with the expectation of being exchanged for some detriment to appellant. East Center neither requested *nor induced* any specific detriment to appellant, nor did it request any benefit for itself in exchange for the promises in the manual.

482 N.E.2d at 973 (emphasis added). Despite its recognition that the employee had not suffered a legal detriment, at least not one induced by the employer, for purposes of showing that she gave valid consideration which could support a finding that she entered into an employment contract, the appellate court nonetheless invoked promissory estoppel for purposes of avoiding an injustice:

> On the specific facts before this court, injustice can be avoided here only by enforcing the promissory representations contained in East Center's manual, to the extent that such promises reasonably intimated that appellant would be terminated only for the reasons stated in the manual.

*Id.* at 974–75. The gap in the logic of the *Jones* decision is that the existence of a promise is merely one element of a promissory estoppel claim, and without evidence of reasonable reliance, no amount of injustice resulting from the "intimations" of continued employment can justify its invocation.

This Court firmly believes that if the Ohio courts, including the Sixth District Court of Appeals, were to consider the promissory estoppel issue in regard to similar facts and circumstances as those at issue herein, the result would be the same as that reached by this Court. Accordingly, as to her claim for promissory estoppel (Count One), the Defendants' Motion for Summary Judgment is SUSTAINED.

 Nicolosi's claim for negligence is also without merit. To show negligence, a plaintiff must show that the defendant owed her a duty, that the duty was breached and that her injury proximately resulted from the breach. *See Freas v. Prater Constr. Corp., Inc.,* 60 Ohio St.3d 6, 573 N.E.2d 27, 30 (1991). Restating her promissory estoppel claim in negligence terminology, Nicolosi argues that McDonald's had a duty to apply discipline in a fair and consistent manner. (Amend. Compl. ¶ 23; Doc. # 34 at unnumbered p. 16.) Perhaps there exists a moral duty to do so, but she has not pointed to any case in which such a legal duty has been recognized.[19] In any event, because she has not shown evidence of either inconsistent treatment or result-

---

**19.** The one case she does cite does not say what she represents. In *Flanigan v. Prudential Sav. & Loan Assoc.,* 221 Mont. 419, 720 P.2d 257, 261 (1986), the Montana Supreme Court recognized that "[a] long-term employee has an expectation of continued employment provided that the employee's work performance is satisfactory." The termination at issue in that case did not concern security policy violations or the "fair and consistent" application of any employee policy. The question was whether a covenant not to terminate a long-term employee but for "good cause" exists in the common law of Montana superceding the competing tenets of at-will employment. That type of theory is inapplicable here. The plaintiff in *Flanigan* was a 28–year veteran who had not violated any company policy. *Id.* Nicolosi, by comparison, was a 4–year employee who had, as she has acknowledged, committed multiple security violations and later failed to report for work as scheduled. The two cases are not comparable.

ing injury, she could not make out her negligence claim even if the duty she asserts were recognized.

Accordingly, as to the negligence claim (Count Two), the Defendants' Motion for Summary Judgment is SUSTAINED.

In sum, the Defendants' Motion for Summary Judgment against Nicolosi (Doc. # 24) is SUSTAINED in all regards.

## V. *Conclusion*

Based on the reasoning and citations of authority stated above, the Court hereby rules as follows:

1) The Defendants' Motion for Summary Judgment against Porter (Doc. # 25) is OVERRULED. Porter's state law claims are not supplemental to Nicolosi's FLSA claim, and she cannot be characterized as a supplemental party thereto. Rather, her claims comprise a separate constitutional case (cause of action) over which this Court does not have jurisdiction. Said claims shall be remanded to the Common Pleas Court of Montgomery County, and said overruling is without prejudice to the Defendants renewing their Motion in the Common Pleas Court.

2) The Defendants' separate Motion for Summary Judgment against Nicolosi (Doc. # 24) is SUSTAINED.

As to Nicolosi, Judgment is to enter in favor of Defendants and against Plaintiff. The Court expresses no views on the merits of Porter's separate and independent cause of action, remanded herein.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.